Goodwin v. Wilbur.

---

### Daniel Goodwin v. James B. Wilbur et al.

1.  CORPORATION—*Who Are Promoters.*—Those who represent the prospective members of a corporation in the purchase of real estate, secure most of the subscriptions to the capital stock of the corporation, get up the prospectus, and hire others to assist in procuring subscrip-

tions, and participate in the doing of everything that is done in the creation and building up of the business enterprise, are promoters of the corporation.

2. SAME—*Relation Between Promoters and Investors.*—The relation created between the promoters and investors is one of trust and confidence. The promoters are bound to act in the interest of all investors, to exercise good faith toward those they ask to invest in the enterprise, and not to conceal from them any fact materially affecting the value of the property they have for sale.

3. DAMAGES—*In Case of Fraud by Promoter.*—In case of fraud caused by a false subscription list the general measure of damages (excluding cases in which punitive damages are allowed) is compensation. The plaintiff should recover the loss which naturally results from the fraud.

4. EVIDENCE—*Of Value of Stock, Where There is No Market Value.*— If, in ascertaining the value of the stock, no market value, for want of sales, can be established, it is proper for the trial court to admit evidence showing the assets and liabilities of the corporation, as tending to show the real value of the stock.

**Action for Deceit.**—Appeal from the Circuit Court of Cook County; the Hon. CHARLES A. BISHOP, Judge presiding. Heard in this court at the October term, 1901. Reversed and remanded. Opinion filed October 27, 1902.

This is an action for deceit.

November 6, 1894, defendant Merritt went to Goodwin and asked him to subscribe for stock in the Sibley Warehouse & Storage Company, which was about to be incorporated. In order to induce Goodwin to subscribe Merritt handed him a copy of the prospectus of the corporation, which had been prepared by the defendants, and a list of the subscribers to such stock up to that date, and stated to Goodwin that they were still shy $15,000 in the needed $500,000 subscriptions for stock, and they wanted him to take the remainder of such stock.

The material parts of the prospectus are as follows:

Prospectus recites the size of the property. The land is valued at $600,000; cost of warehouse over $700,000; total $1,300,000. Warehouses A and B constitute the large main building covering 190 feet on Clark street and 160 feet on the river. Warehouse B immediately back and adjoining A; A, 190 feet long and ten stories high. Warehouse C, which is an entirely separate building from A and B, is

now only two stories high and is not fire-proof. Part of the foundations for a higher building are there, however, and it is proposed to erect a building eighty by 190 feet, ten or twelve stories high, upon a plan uniform with warehouse B, either for ordinary or cold storage. A company is about to be incorporated in this state with a capital stock of $1,500,000, divided into 15,000 shares of $100 each. The name of the company will be Sibley Warehouse and Storage Company. This company will acquire the land, 200 by 240 feet, warehouses A and B, 160 by 190 feet, and the business, at a total cost to it of $1,150,000, which is considered by the best judges to be from fifty to $150,000 less than the property is worth. The company will bond this property for not more than $1,000,000, at five per cent, and sell not less than $500,000 of stock at par, thus realizing $1,500,000. An amount of stock equal to the amount of bonds issued will be held in the treasury until the bonds are paid off, when it can be sold or divided among the stockholders. The money realized from the sale of stock and bonds will be used as follows:

Bonds at par, 5 per cent.... $1,000,000
Stock at par, 5 per cent..... 500,000 $1,500,000

Cost of property........... $1,150,000
To build warehouse C, estimated............... 250,000
Cash in business........... 100,000 $1,500,000

The list of stockholders is as follows:

"Whereas, a company to be called the Sibley Warehouse & Storage Company is about to be incorporated under the laws of the State of Illinois, to purchase the storage warehouse property of Hiram Sibley & Company, in Chicago, such property being bounded on the north by North Water street, on the west by North Clark street, on the south by the Chicago River, and having a frontage from east to west on the Chicago River of 240 feet; now

We, the undersigned, do hereby severally agree that we will severally subscribe for the number of shares set opposite our respective names, of the capital stock of the Sib-

ley Warehouse & Storage Company, so to be incorporated under the laws of the State of Illinois, and we do severally agree to pay the said company on each share the sum of $100, which is to be the par value thereof.

| NAMES. | SHARES. | AMOUNT. |
|---|---|---|
| Jonathan Clark & Sons and friends.... | 1,300 | $130,000 |
| G. W. Sheldon and friends............ | 1,000 | 100,000 |
| Hiram W. Sibley..................... | 500 | 50,000 |
| J. B. Wilbur........................ | 500 | 50,000 |
| H. F. Atkinson...................... | 500 | 50,000 |
| John Griffith....................... | 500 | 50,000 |
| John M. Harlan..................... | 250 | 25,000 |
| Jas. S. Harlan...................... | 100 | 10,000 |
| Geo. Higginson, Jr.................. | 100 | 10,000 , |
| Jarvis Hunt........................ | 100 | 10,000 |
| | 4,850 | , $485,000" |

Goodwin took time to consider the proposition, and then sent to Merritt the following letter:

"November 8th, 1894.

H. S. Merritt, Esq.

Dear Sir: I have examined the prospectus you showed me, as to the Hiram Sibley Fireproof Warehouse, and proposition to incorporate a company to buy and build and manage the same, and the list of stockholders, showing $485,000 of said stock subscribed for. Upon such prospectus and showing I am willing to take one hundred shares of $100 each, total $10,000, and give my note for the same, payable six months after date, with interest at six per cent per annum, secured only by the stock to be issued to me, with the written agreement of the company or the parties selling the stock to me to extend payment of the note for six months if I then desire, when the same becomes due.

Yours respectfully,
Daniel Goodwin."

The next day Merritt replied as follows:

"November 9th, 1894.

Mr. Daniel Goodwin, 98 Washington Street, City.

My Dear Sir: I called at your office to-day and found both you and Mr. Holmes absent, therefore I write to say that your proposition to purchase $10,000 of the stock of the Sibley Warehouse and Storage Company has been accepted. As to the proposition of Mr. Holmes, I can not

give any definite answer at this writing, but will do so the early part of next week, which, I trust, will be satisfactory to both yourself and Mr. H.    I am,

Very truly yours,

H. S. MERRITT.

Enclosed find copy of subscription list to date."

About May 1, 1895, Goodwin gave his notes for $10,000 for 100 shares of the stock at par value, and secured the payment of such notes by a pledge of the stock. He took up the last of these notes December 31, 1896.

The charter of the corporation was filed for record December 31, 1894. It showed that Merritt had subscribed for 14,995 shares, and that Wilbur and four others had subscribed for one share each.

It was not until January 16, 1897, that Goodwin learned that certain of the pretended subscriptions shown on the list handed him by Merritt were false.

Goodwin says that he bought this stock for investment and that he would not have subscribed for this stock had he not believed that the list presented to him was a true list of actual subscribers.

It appeared on the trial without dispute, that Sheldon, who is shown by such list to be a subscriber for $100,000 of the stock of this corporation, was not a subscriber for stock, nor ·in any way liable to the corporation for stock. All that he had agreed to do was to purchase at ninety cents on the dollar $100,000 of the stock to be thereafter issued to Jonathan Clark & Sons Company, in payment for the erection of the new building.

The pretended subscription of Griffiths for $50,000 was not to become operative unless he obtained the contract for the erection of the new building. This contract went to the Clark Co., and thereupon Griffiths was released from all stock liability.

The James S. Harlan subscription of $10,000 was, with the written assent of Wilbur, turned over to the Clark Co. upon its subscription, and Harlan released therefrom.

The case at the conclusion of plaintiff's evidence, on motion of the defendants, was taken from the jury.

PENCE & CARPENTER, attorneys for appellant.

HAMLINE, SCOTT & LORD, attorneys for appellees.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

The declaration originally contained two counts. Three additional counts were added. ' A general demurrer was filed to each of these five counts. The trial court sustained the respective demurrers to the first, fourth and fifth counts, and overruled the demurrers to the second and third counts. These rulings sustaining the demurrers the appellant assigns as error.

The first count is not artistically drawn. The same facts, so far as they are material, are more carefully set out in the remaining counts, and we therefore do not think it is necessary to consider it further.

The fourth count says, that when the defendants applied to Goodwin for his subscription to such stock, they represented to him that the land and warehouses " were to be acquired " at a total cost of $1,150,000; that after the erection of the new building the cash remaining " would " serve as the active capital of the corporation, and that the defendants knowingly, etc., concealed from Goodwin the fact that they " were to receive " the sum of $50,000 in cash and the sum of $100,000 in stock from the executors, etc.

The court is of the opinion that this count sets up nothing more than a false representation of an intention to do something in the future, and that therefore the demurrer to it was properly sustained.

The fifth count sets up that the corporation was fully formed, and that the agreement between the executors and the defendants was carried out before the defendants made the alleged representations to Goodwin, by reason of and believing in which he was induced to become a purchaser of such stock, etc. In our opinion this count sets up a good cause of action, and sustaining the demurrer thereto was reversible error.

The case was tried upon the second and third counts.

The second count sets up in proper legal phrase the representation made by Merritt to Goodwin, that each of the subscriptions upon the list then shown Goodwin was a *bona fide* subscription, while the fact was that of these subscriptions, three, to the amount of $160,000, were not valid subscriptions, and the pretended subscribers thereto were not bound, nor intended to be bound thereby.

This count also sets up the concealment of the intended payment of $50,000 to the defendants for their services as promoters of this corporation; but we think the allegations in that regard are promissory in form, and not sufficient to entitle appellant to put in proof of this alleged payment.

The third count sets up in detail the falsity of the subscription list presented by Merritt to Goodwin, and relies upon that as the foundation of the action.

Goodwin was asked by Merritt to become a subscriber to this stock. After an examination of the prospectus and the list of subscribers shown him by Merritt, Goodwin agreed to take 100 shares at the par value of $10,000. Merritt in his reply letter states : " Your proposition to purchase $10,000 of the stock of the Sibley Warehouse & Storage Company is accepted."

In the organization of this corporation it was necessary, under the statute, that all the stock should be fully subscribed for before the charter could be obtained. Accordingly Merritt subscribed for 14,995 of the shares of stock. It is evident that this subscription was nominal and provisional; but it was the legal subscription, and the *bona fide* subscribers, *i. e.*, those who took and paid for the stock, must take their shares out of those thus subscribed for by Merritt. So that while Goodwin was asked to subscribe for stock, and thought he had done so, he was in reality a purchaser of stock.

The evidence tends to show that Wilbur represented the prospective purchasers of the real estate of the Sibley Warehouse & Storage Company in the negotiations leading up to such sale; that he procured most of the subscriptions to the capital stock of the corporation; that he got up

the prospectus shown to Goodwin; and that he employed Merritt to assist him in procuring subscriptions. These two defendants did everything that was done, or at least participated in the doing of everything that was done, in the creation and building up of this business enterprise. These acts, under the authorities, constituted them its promoters. Bosher v. R. & H. Land Co., 89 Va. 455; Yale G. S. Co. v. Wilcox, 64 Conn. 101, 119. The relation thus created was one of trust and confidence. They were bound to act in the interest of all investors, to exercise good faith toward those they asked to invest in this enterprise, and not to conceal from them any fact materially affecting the value of the property they had for sale. They were under special obligation by the confidence reposed in them, and by the relation of trust in which they stood to Goodwin, to reveal to him the facts that neither Sheldon nor Griffiths were *bona fide* subscribers to this stock.

The concealment of these facts from Goodwin was fraudulent and rendered the defendants liable for the resulting consequences.

The evidence tends to establish that the subscriptions as shown in the list presented to Goodwin had been obtained solely by the defendants. The presumption that they knew which subscription thereon was false, and which was true, is a fair one. Aside from this, the defendants occupied such a position toward Goodwin that the law imputed to them a knowledge of such facts.

At the close of the plaintiff's evidence the court took this case from the jury. What would be the condition of the evidence had the defendants introduced testimony in their own behalf, we do not know; but upon the record as we have it, the evidence tends strongly to prove that the list of subscribers to the stock of this company presented to Goodwin by Merritt was false to the extent of at least $150,000, and this, too, to the then knowledge of the defendants; that Goodwin believed that this list was *bona fide* in every particular, and that upon the good faith of that list and of the prospectus he made his subscription or pur-

chase.   Here was a clear misrepresentation of existing material facts, by relying on which Goodwin was deceived into investing in this stock.

No reasonable business man will say, if Goodwin had been told that of those subscriptions nearly one-third were not *bona fide*, that one of the pretended subscribers was not bound to take or to pay for a single share of the 1,000 shares set opposite his name, and that another was liable for the 500 shares set opposite his name in the event only of his obtaining the contract for the erection of the proposed new building, that he, Goodwin, would have invested in such stock at its par value.

The able counsel for appellee contend strenuously that the measure of damages is the difference, if any, between the price paid by Goodwin for the stock and the actual market value of such stock upon the date of his purchase. The learned judge so held the rule to be in the trial of this case.   They follow this by the assertion that this stock was then selling in the market at par.   We have carefully examined the evidence and do not find the fact to be as claimed.   Warner swore that prior to May 1, 1895, considerable stock was sold at par, but he is able to instance one case only, that of Whitcomb, who, by the admission of this same witness, was a subscriber for stock and not a purchaser of stock.   Sheldon says that no stock was bought of the company prior to May 1, 1895, that par was not paid for.   This stock was not a listed stock, and there is no credible evidence as to its market value prior to May 1, 1895.

The question then recurs—is the measure of damages the difference between the market price of this stock on and prior to May 1, 1895, and the price paid by Goodwin; or is it the difference between the market value of this stock at the time Goodwin discovered the fraud, and the price he paid for the stock ?

The general measure of damages (excluding cases in which punitive damages are allowed) is compensation. The law is that the plaintiff should recover the loss which

naturally resulted from the fraud. It seems to us that the learned trial judge ruled too strictly upon this question.

Goodwin had purchased this stock as an investment. He had so done because he believed that the subscription list shown him was true. He did not discover the falsity of that list until January 16, 1897. He held his stock as an investment up to that time, because until then he continued to believe that the defendants had told him the truth in that regard. When he made that discovery, his cause of action, if any he had, ripened. From that date the statute of limitations began to run against him. His loss, if any, up to that time, was caused by the fraudulent acts of the defendants. In our opinion appellant is entitled to prove the value of this stock up to January 16, 1897.

Although decided by a divided court, the case of Smith v. Duffy, 57 N. J. L. 679, is instructive. There Duffy, by falsely stating to Smith that the corporation owned mines for which it had paid $400,000, induced the latter to purchase from him ten shares of the stock of that corporation. Smith, who purchased for investment, did not know of the falsity of such statement, and kept the stock for two years, and until the corporation failed. The trial judge refused to measure the damages as of the day when the sale took place or for the year next following. The court say :

" We think it clear in the present case that the defendant must have expected, when he made his fraudulent representations, that the plaintiff would probably retain the stock so long as he believed the representations to be true. The plaintiff did so retain it until the company failed, and during all that time the deceit practiced upon him was effective in controlling his conduct. The loss, therefore, actually resulting from the fraud, and which must be presumed to have been within the contemplation of the defendant, was the difference between the plaintiff's investment and the value of the stock after the fraud ceased to be operative— that is, after the failure of the company. In the ascertainment of this difference, the market price of the stock at the time of the sale, or during the year succeeding, or at any time before the failure, was of no importance."

The measure of damages in this case is the amount Good-

win paid for this stock, with interest thereon, less the value of his stock at the time he discovered that the subscription list shown him was false.

If, in ascertaining the value of the stock, no market value, for want of sales, can be established, it is proper for the trial court to admit evidence showing the assets and liabilities of the corporation, as tending to show the real value of the stock. 2 Cook on Corpns. (4th Ed.), Sec. 581. Such evidence was offered on the trial, but was excluded by the court.

We are of the opinion that the learned trial judge erred as to the measure of damages in this case; and that it was error to take the case from the jury at the close of plaintiffs' evidence.

The judgment is reversed and the cause is remanded.