HENRY S. HOTALING, Respondent, *v.* A. B. LEACH & Co., INC., et al., Appellants.

Sale — fraudulent representations —damages — purchase of bond for investment on broker's false representations — purchaser entitled to recover proximate loss — no inference that property was not worth more arises from price for which it was sold by receiver — existence of market where purchaser might have sold does not break continuity of cause and effect — proper measure of damages — participation in plan of reorganization — purchaser not bound to take further risk.

1. In an action to recover damages sustained by plaintiff through the purchase of a bond for investment, induced by fraudulent representations, the plaintiff is entitled to recover the loss which is the proximate result of the fraud that induced the investment. The proximate loss is the difference between the price he paid and the value of what he received when put to the use contemplated by the parties.

2. The price for which the bonded property was sold more than two years thereafter leads to no inference that it was worth no more when plaintiff purchased his bond especially where other evidence establishes that its value was much greater at that time.

3. Plaintiff having purchased for investment, the existence of a market where he might have sold does not break the continuity of cause and effect between the original deceit and the ultimate loss. He was not bound to sell.

4. Where, therefore, some two years after plaintiff purchased his bond, the corporation went into the hands of a receiver who sold the property covered by the trust indenture for an amount, the distributive share of which due plaintiff was but a small part of his investment, the trial judge properly measured the damages by deducting from the price paid for the bond, with interest from the day of payment, the amount which the plaintiff was entitled to receive upon the sale of the property and the interest which was paid to him upon his bond before the sale.

5. A contention that the plaintiff's loss should not be fixed by the amount which the plaintiff was entitled to receive upon distribution of the proceeds of the sale of the property covered by the trust indenture, since he chose to participate in the plan of reorganization, cannot be sustained where participation in that plan was dependent

upon a further investment. The plaintiff was entitled to take or refuse the opportunity of possible profit, with its attendant risk of possible loss.

*Hotaling* v. *Leach & Co.*, 221 App. Div. 756, affirmed.

(Argued December 7, 1927; decided January 10, 1928.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered June 10, 1927, affirming a determination of the Appellate Term which affirmed a judgment of the Municipal Court of the city of New York in favor of plaintiff.

*Harold H. Corbin, Elmer W. Maher* and *Charles E. Gately* for appellants. The determination that the plaintiff suffered damage in the difference between the price of the bond and the amount received therefor violates the well-fixed rule of damages in actions for deceit. (*Reno* v. *Bull,* 226 N. Y. 546; *Falk* v. *Hoffman,* 233 N. Y. 199; *Foster* v. *Di Paolo,* 236 N. Y. 132; *Ochs* v. *Woods,* 221 N. Y. 335; *Urtz* v. *New York Central & H. R. R. R. Co.,* 202 N. Y. 170; *Hussey* v. *Flanagan,* 237 N. Y. 227; *Jones* v. *Morgan,* 90 N. Y. 4; *Duryea* v. *Zimmerman,* 121 App. Div. 500.)

*Charles H. Kelby, John B. Doyle* and *A. Gordon Murray* for respondent. The measure of damages was correct. (*Industrial & General Trust, Ltd.,* v. *Tod,* 180 N. Y. 215; *Gould* v. *Cayuga County National Bank,* 99 N. Y. 33; *Wakeman* v. *Wheeler & Wilson Manufacturing Co.,* 101 N. Y. 205; *Foster* v. *Di Paolo,* 236 N. Y. 132; *Smith* v. *Duffy,* 57 N. J. L. 679; *High* v. *Berrett,* 140 Penn. St. 261; *Jordan* v. *Decorative Co.,* 230 N. Y. 522.)

LEHMAN, J. In January, 1920, the plaintiff purchased from the defendant A. B. Leach & Co., Inc., a bond for the sum of $980. The bond was part of an issue of $5,000,000 of par value 7% first lien serial gold bonds of the National Oil Company of New Jersey, secured by a trust indenture upon its property. For some time the

plaintiff received interest on the bond he had purchased. The National Oil Company of New Jersey encountered financial difficulties about January 1st, 1922. A receiver of its property was appointed in May, 1922. Proceedings to foreclose the trust indenture given to secure the bond issue followed. The property covered by the indenture was sold on October 20th, 1922. The property was bought at public sale by the bondholders' protective committee. The report of the special master states that the price realized was $50,000. Bonds to the value of $4,000,000 had been deposited by the holders with the protective committee at the time of the sale or at least before the purchase price was paid. The protective committee did not pay the full purchase price in cash. After payment of the expenses of the sale the *pro rata* share of the proceeds of the property distributable upon each bond was only the sum of five dollars and eighty-four cents. The protective committee paid the amount required for such distribution upon the bonds not deposited with it. It received credit for the amount distributable upon the bonds deposited with it and proper indorsement was made upon each bond. The plaintiff deposited his bond with the protective committee in the interval between the sale of the property covered by the trust indenture and the payment of the price. The reorganization plan in which the plaintiff might participate required a payment of $150 upon each $1,000 bond. Each depositing bondholder became entitled in return to receive $166.66 in new first lien 7% bonds, $1,000 in new 7% preferred stock and $100 in new common stock. In 1924 the plaintiff began this action to recover damages for alleged fraud by the defendants in the sale of the bonds. The trial court found that the defendants had induced the plaintiff to purchase the bond by fraudulent representations.

The pleadings in the case were oral and the trial court did not make any detailed findings of fact. The trial

was protracted and much evidence was presented by the plaintiff. Upon this appeal we are not asked by the defendants to review the question of whether there is evidence sufficient to sustain the finding of fraud. The trial judge measured the damages by deducting from the price paid for the bond, viz., the sum of $980 with interest from the date of payment, the sum of $5.84, the amount which the plaintiff was entitled to receive upon the sale of the property covered by the trust indenture, and the interest which was paid to plaintiff upon his bond before that sale. Judgment was awarded to the plaintiff for the difference. The only question we are asked to consider is whether the correct measure of damages was applied.

The damages awarded must represent the loss which the plaintiff sustained through the purchase and continued ownership of the bond. In return for the bond he gave up the sum of $980. He bought for investment, not speculation. Before payment of the principal of the bond became due, the property subject to the lien of the bond was sold. The plaintiff still held the bond. He was entitled to payment of a *pro rata* share of the proceeds of the sale, viz., the sum of five dollars and eighty-four cents. That sum, and the 7% interest previously received, represents all that the plaintiff has obtained, or so far as the record shows, could obtain as a direct result of his continued ownership of the bond. The plaintiff should be entitled to recover from the defendants the loss which is the proximate result of the fraud that induced the investment; the defendants should not be held liable for any part of plaintiff's loss caused by subsequent events not connected with such fraud.

" The true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong." (*Reno* v. *Bull,* 226 N. Y. 546.) Ordinarily the actual pecuniary loss sustained as a direct result of fraud which induces a purchase of a chattel is the difference

between the amount paid and the value of the article received. The seller's fraud is ordinarily complete and its effect exhausted at the time of the sale and transfer of the chattel. The buyer might sell or retain what he had bought. Subsequent increase or decrease of value might bring profit or loss to the buyer, but such profit or loss would be the result of subsequent events and of choice by the buyer whether to hold or sell. It would not be the direct result of the seller's wrong nor increase or diminish his liability. The rule is general that actual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages. Varying circumstances must logically require variation in the application of that measure of damages. In *Reno* v. *Bull* (*supra*) we applied that measure of damages in the case of a sale of corporate stock where there were no extraordinary features. We did not hold that other cases might not require a different application of the rule.

In the present case the evidence produced by the plaintiff shows that the defendants purchased the entire issue of $5,000,000 bonds from the National Oil Company. Included in the consideration received in return for the purchase price was a large amount of corporate stock. The defendants proceeded to sell to others the bonds they had purchased. They issued a circular containing a statement of the past earnings and of the property owned by the National Oil Company and its subsidiaries. In writing and through its salesman the corporate defendant recommended the bonds for investment. Critical examination of the statements contained in the circular leaves some doubt as to whether any of them was literally untrue. As a whole the circular presents a picture which would lead an investor to believe that the security behind the bonds offered was far greater than was the fact. Doubtless the defendants would not themselves have paid more than four and a half million dollars for the bonds and accompanying stock if they had not believed that

the oil company would be successful, yet it may be noted that the defendants received for that purchase price, in addition to the bonds, a block of stock so considerable as to suggest that the defendants may have expected large profits upon commensurate risk. Perhaps enthusiasm may have dazzled the defendants and led them to disregard facts which tended to show that the picture as painted for investors was deceptive, if not literally untrue. The evidence may leave room for doubt whether the defendants were guilty of conscious fraud; yet the defendants do not maintain that there is not evidence from which the inference may be drawn that the defendants sold a bond to the plaintiff for investment by means of oral representations and a circular which, both through assertion and concealment, tended to deceive and did in fact deceive.

The evidence shows beyond dispute that the oil company had at that time some property of value, even though the circular may have been to a considerable degree deceptive, and factors which entered into that value were misrepresented. There is no claim that the moneys it received from the bond issue were stolen or misapplied by the corporate officers. If conditions in the oil trade had not become demoralized, perhaps the oil company might have been sufficiently successful to pay the principal sum represented by the bond issue. All that is conjecture. The fact is that conditions in the oil trade did become demoralized and the oil company went into the hands of a receiver. The subsequent sale of its property for $50,000 does not lead to any possible inference that its property was worth no more at the time when the plaintiff purchased his bond, over two years before the receiver was appointed. The sale was a forced sale; the only bidder was the bondholders' protective committee. Other bidders would be compelled to pay the full purchase price in cash; that bidder could be compelled to pay in cash only the proportion of the amount realized on the

sale which would be distributable to bondholders who had not deposited their bonds. It may be doubted whether the price paid at such a sale is any evidence of the value of the property sold even at the time of the sale. (*Knickerbocker Life Ins. Co.* v. *Nelson,* 78 N. Y. 137; *Parmenter* v. *Fitzpatrick,* 135 N. Y. 190; *Brady* v. *Finn,* 162 Mass. 260; *Koski* v. *Haskins,* 236 Mass. 346; *West Skokie Drainage Dist.* v. *Dawson,* 243 Ill. 175; *Martinett* v. *Maczkewicz,* 59 N. J. L. 11; *Matter of McAusland,* 235 Fed. Rep. 173.) There can be no doubt that it does not permit any inference that the property was worth no more when the plaintiff bought his bond, since other evidence establishes beyond possible doubt that its value was much greater at the earlier period. The master's report establishes that the plaintiff could not by any legal proceedings obtain a payment of more than $5.84 upon his bond. It establishes nothing else.

If we hold that the plaintiff's damages are the difference between the market value of his bond at the time of its purchase and the price paid, we deny him all remedy in an action at law for the deceit. The plaintiff was not bound to sell. He had purchased for investment. He had no information which should have led him to believe that the prudent course was to sell. Since he was induced to purchase for investment, the existence of a market where he might have sold does not break the chain of cause and effect between the original deceit and the ultimate loss. The price at which the bond would sell in the market might not even represent its real value. The defendant was at that time engaged in marketing the bond issue it had bought. The market price of the bonds would naturally be affected by the representations contained in the circular. Sales of the corporate securities are not shown to have been unaffected by the defendant's position. It has been held under somewhat analogous conditions that even though in fixing the plaintiff's loss, the real value of the plaintiff's securities

at the time they were received by him must be taken as a basis, and " events injurious to the company, which occurred not from intrinsic defects in it, but from events which happened after the purchase, cannot be taken into account; if there is no better evidence, the result of the winding up of the company and the amount which will be returned to the shareholders may be taken into account." (*Peek* v. *Derry*, 37 Ch. D. 541. See, also, *Twycross* v. *Grant*, 2 C. P. D. 469; *Whiting* v. *Price*, 172 Mass. 240.)

In the present case the question is complicated by two circumstances. The property purchased is a bond, a chose in action whose intrinsic value is dependent solely upon the debtor's ability to pay when payment becomes due, and in addition the bond was recommended as an investment and defendant was informed that it was bought for that purpose. Even if we had evidence upon which a definite estimate might be made of the value of the company's property which was covered by the trust indenture and constituted security for the bond issue, we should not be able to fix with certainty the value of the bond. The oil company held the stock of subsidiary companies which in turn owned the tangible assets. The stock of the subsidiary companies was pledged, their tangible assets were still at the risk of the business. Probability of payment of the bond issue depended primarily upon the success of the business and its efficient management. Though the company might not have failed if conditions in the oil trade had not become disturbed, there is room for inference upon this record that these disturbed conditions would not have caused the failure if the enthusiastic statements of the value of the company's assets contained in the circular had been true. On the other hand, if a complete and accurate picture had been given of the oil company's position, an expectant investor might have hesitated and drawn back with a reasonable fear that any adverse

change in business conditions would bring ruin to the company. That ruin came with change of conditions. The effect of the representations of the defendant did not cease with plaintiff's purchase. He continued to hold the bond for investment in accordance with the defendant's recommendation. Loss of his investment followed because the weakness of the company had been concealed from him by defendant.

Proximate damages may not be fixed by arbitrary rule. Sometimes other damages flow from fraud in inducing a purchase, besides the difference between the price paid and the value of the article received. Consequential damages may also be awarded. (See Sedgwick, Measure of Damages [9th edition], section 441; *Jeffrey* v. *Bigelow,* 13 Wend. 518; *Rose* v. *Wallace,* 11 Ind. 112; *Merguire* v. *O'Donnell,* 103 Cal. 50; *Tuckwell* v. *Lambert,* 5 Cush. [Mass.] 23.) It has been held in some cases that damage should be fixed by taking the value of the article purchased at the time the fraud was discovered. (*Smith* v. *Duffy,* 57 N. J. L. 679; *Goodwin* v. *Wilbur,* 104 Ill. App. 45.) Such a rule, if unvaryingly applied, might allow a defrauded purchaser to include in his damage a loss which was the result of an intervening cause distinct from the fraud. It has not been generally accepted. At least the plaintiff's proximate damages should be the difference between the price paid upon the purchase and the value of the bond at that time as an investment, the purpose for which it was understood that the plaintiff was buying. Ultimate loss of the investment was due to weakness inherent in the investment concealed by the defendant. That weakness might not under all circumstances have produced the ruin of the company. It did produce that ruin when conditions demanding greater financial strength arose in the oil trade. The loss proximately caused by the defendant's fraud is the difference between the price he paid and the value of what he received when put to the use contemplated by

the parties. In this case that value must be determined in the light of subsequent events. As long as the fraud continued to operate and to induce the continued holding of the bond, all loss flowing naturally from that fraud may be regarded as its proximate result. Change of conditions may have been a subsidiary cause; it was not an independent cause. The loss sustained is directly traceable to the original misrepresentation of the character of the investment the plaintiff was induced to make.

It is said that the plaintiff's loss should not be fixed by the amount which the plaintiff was entitled to receive upon distribution of the proceeds of the sale of the property covered by the trust indenture, since he chose to participate in the plan of reorganization. Participation in that plan was dependent upon a further investment of $150. The plaintiff was entitled to take or refuse the opportunity of possible profit, with its attendant risk of possible loss. The record in this case does not show whether profit or loss resulted. In either event it would be the result of a new choice by the plaintiff, to invest, and not of the original choice which was induced by defendants. Profit or loss upon the new investment does not increase or decrease the loss suffered by the original deceit. We speak now only of the circumstances disclosed by this record. It is common knowledge that at times the right of corporate stockholders or bondholders to participate in a reorganization plan is far more valuable than the right to share in the distribution of the proceeds of the sale of the corporate assets. Such value will ordinarily be reflected in the market price either of the corporate securities or of the derivative rights to share in the reorganization. Value, which may be realized by sale without additional risk, may not be disregarded in fixing the loss caused by the original investment. The record here does not admit of any inference that the plaintiff's right to share in the reorganization plan had in itself any value, or that his bond or rights

derived from the bond could have been sold at any price. It does appear that holders of bonds of the value of $1,000,000 did not choose to exercise their right of participation.

For these reasons we find in the evidence sufficient basis for the rule of damages applied.

The judgment should be affirmed, with costs.

CARDOZO, Ch. J., POUND, CRANE, ANDREWS, KELLOGG and O'BRIEN, JJ., concur.

Judgment affirmed, etc.