JOSEPH H. YASWEN, Plaintiff, *v.* MICHAEL POLLOCK, Defendant.

Municipal Court of New York, Borough of Queens, Second District, October 1, 1934.

*Benjamin Rothenberg [William E. Kennedy of counsel], for the plaintiff.*

*Stanley S. Lieberman, for the defendant.*

PETTE, J.  The question presented is rather peculiar, but easily capable of solution in terms of law.  The parties are prominent members of the honorable medical profession, and their acquaintance of some fourteen years' standing dates back to the days when they were classmates in college and medical school. They were associated in business and have been intimate friends.

They both knew Dr. Potter, " one of the best minds in Columbia," who had been their instructor in surgery, and they both, as well as others, highly regarded his opinion. About July, 1928, Dr. Potter referred a Mr. Sullivan to the defendant as a patient, due to the fact that Mr. Sullivan resided in Queens where defendant had his practice. Mr. Sullivan had invented a gasoline vaporizer which was intended to dispense with carburetors in automobiles, and for which an application for a patent was pending. In the course of his treatments, Mr. Sullivan stated the facts concerning his invention to the defendant, and informed him that he had organized the Sullivan Vaporizer Corporation; that he was still working on perfecting the device; that he had installed it on several trucks and one on Dr. Potter's car; that they worked well, and that several physicians were interested in it. Mr. Sullivan also showed the defendant some correspondence whereby it appeared that the Chrysler Corporation was interested and intended to give the device a trial. Then Mr. Sullivan asked the defendant if either he or his friends would be interested in buying stock, to which defendant replied that he himself could not purchase any stock because he was then buying a home, but he would inquire among his friends. As a result, plaintiff and another, an insurance agent, became interested in the proposition, although the latter did not finally purchase any stock. The defendant did not make any investigation of the invention, but, as he informed plaintiff, he depended solely on Dr. Potter's opinion and integrity in referring him to the stock. The defendant did not himself buy any stock, but he informed Mr. Sullivan that the two friends desired to buy 200 shares of stock each. The defendant neglected to give the names of the friends to Mr. Sullivan, and this resulted in two certificates being issued in defendant's name. One of the certificates the defendant gave to plaintiff, who delivered $1,000 to defendant, which he, in turn, paid to the corporation. The other certificate, which the insurance agent had refused, was returned to the company by the defendant. On October 2, 1929, fifteen months after the stock had been issued, plaintiff learned that the certificate had been issued in defendant's name, and thereupon asked the defendant to assign the certificate to him, which was done. In November, 1929, plaintiff received notice of a stockholders' meeting which he attended, at which defendant was not present. At that meeting Mr. Sullivan made a plea for contributions to help the corporation, which was then insolvent, and since no financial assistance was had, Mr. Sullivan declared the corporation bankrupt. The following day plaintiff informed defendant of what had transpired at the meeting and asked him to indemnify him, that is,

to pay him the full purchase price, upon the ground that defendant had defrauded him in making statements connected with sale of the stock. What followed after plaintiff made this demand may be gathered from the conflicting versions given by plaintiff and defendant upon the trial, to the effect, as the preponderance of evidence impresses me, that plaintiff pleaded with defendant that he, plaintiff, had lost a great deal of money and was in such a bad financial condition that he could not pay his rent, and asked defendant that since he had been influential in referring him to the stock, that he should help him out of his difficulties. Plaintiff asked defendant for $500, which he said he needed badly, stating that he had lost practically everything he had in the market, that he had no practice and that defendant still had his own practice. Thereupon defendant, moved by his friend's plight, as it was then represented to him, agreed to give him $500, of which $300 was paid in various amounts at irregular intervals, up to a point when the defendant discovered that plaintiff had property in the Bronx and that hence the representations he had made concerning his impoverished status were false. The defendant thereupon refused to make any more payments to plaintiff and this action followed.

Recovery of the balance of $700 is sought on the theory that the stock was worthless when plaintiff bought it; that defendant induced plaintiff to purchase the stock by fraudulent representations, and that defendant agreed to make good any loss plaintiff might sustain. Defendant denies any fraud and any agreement to indemnify, and in addition submits that the Statute of Frauds operates against the enforcement of the oral agreement, assuming that one was made. Defendant also claims that plaintiff suffered no actual loss. Counsel for both sides have filed instructive briefs carefully treating the questions, which have aided me in reaching my conclusion, and since the same is based upon the merits of the case, I shall brush aside any technical defense. Both the tort and contract phases of the case are considered together.

I cannot subscribe to plaintiff's contention that he was defrauded by defendant. The greater weight of evidence induces the view that the defendant merely recommended the stock to plaintiff, with whom he had associated for years, because he, defendant, in good faith believed that the stock might appreciate in value on that account. Dr. Potter, who referred the inventor to defendant, thought so much of the device that he himself purchased 3,000 shares at five dollars each, about a year before the transaction involved here. Plaintiff was advised of that fact by defendant. It is admitted that Dr. Potter's opinion was highly valued and respected by both parties and by the medical profession. The

directors of the corporation were mostly eminent physicians and surgeons. When plaintiff purchased the stock, the corporation was functioning. It owned the rights to the invention and was manufacturing the device at its own plant. The results obtained from the operation of the mechanism upon trucks and upon Dr. Potter's own car, indicated that the device, in Dr. Potter's own words, was " extremely useful." There were prospects that the patent might be purchased by the Chrysler Company, in which event there might be great profits on the original investment of the stockholders. Naturally enough, the project was highly speculative, and any person undertaking to enter into the venture must be ready to accept the risk of partial or total loss. It is common knowledge that in the few years preceding the spectacular and memorable debacle of 1929 great masses of people of all conditions yielded to the speculative impulse with which the very atmosphere was then charged, and were dabbling in the stock market, from which many hard-earned savings never returned. *Quae nocent, docent.* The corporation involved was organized about 1927, and plaintiff made his purchase in 1928. That a group of eminent medical men should embark upon the exploitation of the apparatus speaks well for it, and is noteworthy in the sense that the scientific mind must have been attracted to the invention by reason of the facility which it afforded of disintegrating the gaseous molecules, and hence, giving rise to a justifiable expectation that the present troublesome carburetors would be displaced. When the tests proved successful, it is perceivable that a brilliant and emotional picture of the future was perhaps envisioned by all concerned. It was this and the fact that the mutual friend, Dr. Potter, had materially and heavily invested in the proposition that prompted defendant to speak of the stock to his friend, the plaintiff, adding, it may·be, his own vivid notions of prospective benefits which might be derived. Plaintiff is in error in claiming that defendant sold his own stock, because defendant owned no stock and the circumstances point to the fact that defendant acted as a mere intermediary between the corporation and the plaintiff. While both certificates issued by the corporation bore defendant's name, a fact of which he was not then aware, they did not belong to him, because one was returned when the insurance agent refused to consummate the deal, and the other was paid for and delivered to plaintiff, who, fifteen months later, had the defendant transfer it to him by indorsement. It appears that even the plaintiff failed to discover that his name was not upon the certificate, otherwise he would have naturally asked that it be inserted. Also the undenied evidence is that defendant did not even ask for, expect

or receive any commission for the transaction. All of this demonstrates that defendant had no pecuniary interest, and no interest of any kind in the deal, except that of seeing his friend make a good investment of money well and capably earned. True friendship requires just that, and many things daily transpire in our social life which are predicated on no other basis than friendship, with no thought of reward, but only a satisfied conscience and a pervasive feeling that retribution will some day assert itself in kind. Indeed, the friendship of defendant for plaintiff manifested itself so tangibly and forcefully that he paid to plaintiff $300 of his own savings to help him, as plaintiff represented, out of a great financial predicament. I have no doubt that the payment, as defendant submits, was merely out of a feeling of moral obligation, which evidently received a setback when defendant discovered that plaintiff's claim of poverty was untrue, whereupon defendant refused to finish paying the $500 which he admits having agreed to give to plaintiff to help him recoup his loss.

But a distance separates a moral obligation from an acknowledgment of fraud, or from an agreement to indemnify. I am satisfied that at the time the stock was purchased, defendant did not agree to save plaintiff harmless from any loss. I am also of the opinion that the defendant's willingness to give plaintiff $500 and the payment of $300 do not demonstrate the existence of an original agreement to indemnify, or the acknowledgment of fraud, but rather, as defendant submits, since he had been influential in referring plaintiff to the stock, that he would help him, out of sympathy for his plight, to the extent of $500.

Defendant was not promoting and had no financial interest in the sale of the stock. He owed no duty to plaintiff in the transaction, except to refrain from making false statements calculated to deceive. There was no trust or fiduciary relationship. What defendant said in describing the invention and the stock were at most suggestions and statements of opinion, made in good faith, and form no basis for fraud. There is no evidence that at the time of the purchase the corporation was insolvent, but on the contrary, it appears that the concern was not declared insolvent until sixteen months later. I do not believe that defendant told plaintiff that the Chrysler Corporation had bought the invention, since the preponderance of evidence points to the truth of the defendant's testimony that he told plaintiff that Mr. Sullivan had shown him correspondence to the effect that the automobile concern intended to give the device a trial. Certainly, from July 7, 1928, when the stock was purchased, to December, 1929, when the corporation became insolvent, the plaintiff had ample time to

ascertain the truth, and it does not appear that he tried to do so. The fact remains that the first demand he ever made to be reimbursed was after the crash in the stock market and after the corporation became nominally, though not officially, bankrupt. All of this characterizes the later efforts of plaintiff to obtain indemnity from defendant, first by pleas of poverty and then by this action, *sub prætexta juris*, as an attempt, decidedly unfriendly, to make his friend compensate him for his unlucky speculation. Fortunately, however, certain established principles of law governing fraud and deceit interpose a bulwark which reduces this action to a *fulmen brutum*.

(1) He who alleges fraud must prove it, since it will not be presumed. (*Reno* v. *Bull*, 226 N. Y. 546.) (2) The essential constituents of an action for fraud are "representation, falsity, *scienter*, deception and injury." (*Ochs* v. *Woods*, 221 N. Y. 335, 338.) (3) "The representations of a vendor as to extrinsic facts, affecting the quality or value of the subject of the transaction of sale and which are peculiarly within his knowledge, may be relied upon by the purchaser." (*Schumaker* v. *Mather*, 133 N. Y. 590; *Isman* v. *Loring*, 130 App. Div. 845.) (4) To constitute "actionable fraud, the false representation relied upon must relate to a past or existing fact, or something equivalent thereto, as distinguished from a mere estimate or expression of opinion." (*Bareham & McFarland, Inc.*, v. *Kane*, 228 App. Div. 396, 397, 398; *Benz* v. *Kaderbeck*, 241 id. 583.) (5) "Unquestionably it has long been the settled rule of law in such actions that they will not lie for a false or an erroneous assertion concerning a mere matter of judgment or opinion." (*Schumaker* v. *Mather, supra*, 594.) (6) There is no fraud when the alleged false representations are promissory in their nature. Unfulfilled predictions or erroneous conjecture as to future events are not actionable. (*Eichorn* v. *Serlis & Co., Inc.*, 118 Misc. 256; 26 C. J. 1087.) (7) Pecuniary loss to the injured party is "absolutely essential to the maintenance of the action. Fraud and deceit alone do not warrant the recovery of damages. Deceit and injury must occur." (*Urtz* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 170, 173.) (8) "The basic principle underlying all rules for the measurement of damages in actions for fraud and deceit is indemnity for the actual pecuniary loss sustained as the direct result of the wrong." (*Urtz* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 175; *Krumm* v. *Beach*, 96 id. 398; *Foster* v. *Di Paolo*, 236 id. 132, 134.) (9) "The question is what was the value of that with which plaintiff parted and what was the value of that which she received." (*Urtz* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 170, 175.) (10) The difference as shown by the answer

determines the damages recoverable. (*Hotaling* v. *Leach & Co.*, 247 N. Y. 84, 88.) The enforcement of any measure of damages when loss and damage are wholly lacking is "impossible and inconceivable." (*Urtz* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 170, 174.)

In the case at bar the evidence negatives the idea that defendant was in a position to know or that he had "facts peculiarly within his knowledge" so as to make him answerable for any false statements upon which the purchaser may have relied. Defendant's expressions amounted to mere estimates or statements of opinion, embellished probably by his own imagination, but nevertheless they did not rise to the character of false representations with intent to deceive. There is no evidence upon which an intent to deceive may be inferred. He owned no stock, was not financially or otherwise interested in the concern, expected no commissions and had nothing to gain or lose. Had such elements existed, intent might be spelled out. At the time of the purchase, the corporation was a going concern. The stock was not upon the open market, and its value there was problematical, depending upon whether the invention made successful progress. Plaintiff was satisfied to pay what he did for the stock, and there is no test by which to determine whether that amount represented the true value of the stock at the time. But by purchasing the stock plaintiff did not receive just a piece of paper. What he in fact got was a *pro rata* interest in the invention itself, the ultimate value of which no one could foretell. The underlying theory of this action is that plaintiff received no value for his money. I cannot concur in that view, for the reasons stated, and for the additional reason that while the corporation is nominally bankrupt, it has not been so adjudicated by the courts, and still owns the invention, patent or patent rights, which may still be valuable, as experience has shown.

While the concern was struggling to advance its product, plaintiff did not complain. It does not savor well, after the general market deflation caused the best of stocks to tumble, and engulfed this embryonic corporation in the process, for this friend to seek redress from a friend who has been placed in the position of defendant by his naked desire to see a friend make what he had been led to believe was a good investment. If this action were to be successful, no person would ever dare make any suggestion or give any opinion upon any given proposition, because it would be dangerous for him to do so. Much less is this suit appropriate five and a half years after the purchase, four years after the insolvency, and two years after the defendant made his last payment which brought the total to $300.

Regardless of .defendant's conception of friendship, yet shall the qualities of friendship forever temper the conduct of mankind, for that is one of the most valuable attributes of life itself. Had the stock gone skyrocketing, the courts would never have heard of these gentlemen whose scientific training holds them in contact, *de diem in diem*, with the mysteries of life. Virtue kindles strength, and many virtues there are, equally possessed by the human brotherhood, among which is the one — *virtus in arduis* — courage in difficulties — only too often ignored in the struggle for the omnipotent *l'argent*. Virtuous and noble, indeed, is he who can be steadfast and not ready to impugn a well-meant deed *ex post facto*, in case the fates rule adversely to his expectations. The following quotation from the pen of the late Ella Wheeler Wilcox appropriately expresses my sentiments occasioned by final reflection upon the incidents that have given me considerable concern in this case:

" WORTH WHILE
" It is easy enough to be pleasant,
    When life flows by like a song,
But the man worth while is the man who will smile
    When everything goes dead wrong.

" For the test of the heart is trouble,
    And it always comes with the years,
And the smile that is worth the praises of earth,
    Is the smile that shines through tears."

*Amicus usque ad aras!* What a far-reaching, priceless virtue! Judgment for defendant.