THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* S. W. STRAUS & Co., INC., and Others, Defendants.

In the Matter of the Claim of JOHN FELTHAM against LOUIS F. SCHULTZE, Permanent Receiver of S. W. STRAUS & Co., INC., etc.

Supreme Court, Kings County, June 7, 1935.

*Nathaniel L. Goldstein* [*Edmund W. Van Voorhis* of counsel], for the receiver.

*Pollock & Nemerov* [*Nathan Glucksman* of counsel], for the claimant John Feltham.

*Glass & Lynch* [*Simon Brett* and *Jerome Weinstein* of counsel], for the receivers of S. W. Straus & Co., Inc., of Delaware, and creditors.

GORDON (HARRY A.), Referee. S. W. Straus & Co., Inc., a domestic corporation, was organized in 1916. It took over a business established in 1882. The business consisted in the main of underwriting and selling to the public bond issues secured by real estate mortgages. Until 1924 it sold first mortgage bonds. Thereafter it included in its offerings leasehold, collateral trust, second and third mortgage bonds, and debentures wholly unsecured. As a result of the decline in real estate values which followed the economic collapse of 1929, it failed in business. On March 3, 1933, permanent receivers were appointed. It, its predecessors and affiliates had sold to the public an aggregate of approximately $1,000,000,000 of bonds since 1882. Approximately $365,000,000 of these bonds remained unpaid at the date of the receivership.

About 1,300 claims in fraud were filed against the receiver by bondholders. It is asserted that the representation was made that what was sold were first mortgage bonds, whereas the security was a subordinate lien or nothing. In most instances the claimants elected to rescind and claim the consideration paid. In a number of cases the claimants elected to retain their bonds and seek damages in deceit. The claim here asserted is in the latter class.

John Feltham, the claimant, commenced to purchase bonds from S. W. Straus & Co., Inc., in 1924 through one Gillette, one of its officers and salesmen. Beginning with 1926, he purchased a $1,000 bond, interest six and one-half per cent, secured by mortgage on the leasehold covering 277 Park avenue, for $1,000; two $1,000 bonds, interest six and one-half per cent secured by second mortgage on 2 Park avenue, for $1,930.20; two $1,000 bonds, seven per cent interest, secured by second mortgage on New York Athletic Club, for $2,000; and one $500 bond, six per cent interest, secured by a general mortgage on Forty-third street and Fifth avenue, for $473. The aggregate cost of these bonds was $5,403.20. None of these bonds were in fact secured by a first mortgage on the fee. The

277 Park avenue bond was secured by a mortgage on a leasehold, and the others by second mortgages.

The claimant testified that he told Gillette that he wanted bonds "absolutely secured;" that Gillette represented that the bonds were first class securities and good investments; that it was never disclosed to him that one bond was secured by a mortgage on a leasehold and the others by second mortgages; that before he purchased these bonds he was shown a pamphlet which contained the slogan which S. W. Straus & Co., Inc., had adopted in its business, that for forty-two years there had been no loss to any investor. This representation was in fact true. Until 1931 there were no losses. He was told that S. W. Straus & Co., Inc., would stand behind the bonds, both as to principal and interest, and that they could be sold at any time at practically par, "with a small interest charge and commission." The bonds on their face indicated the character of the mortgages which secured them. He testified that he did not examine them and did not discover the fraud until the receiver was appointed on March 3, 1933.

It is claimed that on the date of the receivership the bid and asked prices for these bonds were as follows:

277 Park avenue, 2½ bid; 5 asked, $25 to $50 for the $1,000 bond;

2 Park avenue, 14 bid; no asking price, $280 for $2,000 bonds;

New York Athletic Club, 5 bid; 10 asked, $100 to $200 for $2,000 bonds.

Forty-third street and Fifth avenue bonds, no bid; 5 asked, $25 for $500 bond.

Based upon these quotations, it is asserted that the value of these bonds on the date of the receivership was about $492.50. The difference between the cost and that amount, approximately $5,000, is the damage claimed here.

It will be assumed that the fraud charged has been proved. The question whether S. W. Straus & Co., Inc., may be held for the misrepresentations of the salesman is reserved for later consideration.

The principal question presented is the correct measure of damages to be applied. This is not a case in which the investment is irretrievably lost. No claim is made that the property which secures the bond has been foreclosed, sold and the loss on the bond definitely fixed. No evidence has been offered as to the probable future of the security or financial outlook of the obligor. Improvement in conditions may restore full value to these bonds. A continuance of the depression may render them worthless. The evidence, however, establishes, and judicial notice may be taken, that there has been practically no real estate market for several years. Where

a forced sale is had, those in whose interest it is held are compelled to bid in at any price.

The claimant seeks to recover the difference between what was paid for the bonds and their market value on March 3, 1933, when the receiver was appointed. It is not seriously contended that there was any actual real bond market at the time of the receivership or since. Isolated sales, if any there were, do not indicate actual value. The claimant, however, asks that the market value of these bonds at the date of the receivership be fixed on the basis of the reported bid and asked prices. No evidence was given of any sales or of actual offers to buy or to sell at that time. The appraisement of value is based upon quotations reported to so-called over-the-counter brokers in New York city by a quotation service company, which acquired its information solely by inquiry over the telephone from firms engaged in the business of buying and selling bonds of a similar character. These bonds were not traded on any exchange.

Aside from the question as to the probative value of this testimony to establish market value of these bonds, there is presented the fundamental question as to the date as of which the damage is to be assessed. The question would be easy of solution but for the claimant's assertion that *Hotaling* v. *Leach & Co.* (247 N. Y. 84) overrules the earlier rule of damage declared in *Reno* v. *Bull* (226 N. Y. 546) and establishes a new rule of damage in actions in deceit arising out of the purchase of bonds as distinguished from other personal property. The claimant asserts that under that decision the rule of damage in all cases of fraud practiced in the sale of bonds is not the difference between what was paid and the value at the time of acquisition, but rather the difference between what was paid and the value of the bond at the time of the discovery of the fraud.

It is urged by the claimant that the more recent decision lays down a new rule of damage for property acquired as an investment; that since bonds are bought at par it is to be presumed that they were purchased for investment.

It remains to be considered whether *Hotaling* v. *Leach & Co.* declares a new rule of damage, or whether that decision was intended to apply only to the peculiar facts there involved and does not over-rule *Reno* v. *Bull*. Prior to the decision in *Reno* v. *Bull*, the general rule of damage in actions in deceit was practically the same as in actions for breach of warranty. The defrauded party was permitted to recover for the loss of his bargain resulting from the misrepresentation. His profit was reckoned in the damage. The difference between the actual value of the chattel purchased and the value it would have had, had the representations been true, was the rule of recovery. In such circumstances a party defrauded

was permitted to recover damages notwithstanding that the actual value of what he purchased was in excess of the purchase price when, had the representations been true, it would have had a larger value. (*Hubbell* v. *Meigs*, 50 N. Y. 480; *Krumm* v. *Beach*, 96 id. 398, 406, 407; *Spotten* v. *De Freest*, 140 App. Div. 792; *McDowell* v. *Volk*, 164 id. 311.)

The rule was changed in *Reno* v. *Bull*. It was there declared that " The true measure of damage is indemnity for the actual pecuniary loss sustained as a direct result of the wrong."

In *Hotaling* v. *Leach & Co. (supra)* Judge LEHMAN said (at p. 88): " Varying circumstances must logically require variation in the application of that measure of damages. * * * We did not hold [referring to *Reno* v. *Bull*] that other cases might not require a different application of the rule." It was held in that case that the circumstances there presented required a variation in the application of the rule of damages declared in *Reno* v. *Bull*.

In *Hotaling* v. *Leach & Co. (supra)* the defendant Leach & Co. acquired from the National Oil Company of New Jersey $5,000,000 serial gold bonds, secured by a trust indenture, and a large block of the common stock of that corporation. It paid for both $4,500,000. It retained the stock and sold the bonds to the public. The plaintiff purchased a $1,000 bond in 1920 for $980. In connection with the sale of this bond the defendant issued a circular containing misstatements of the past earnings and of the property owned by the obligor and its subsidiaries. After the issuing of the bond, conditions in the oil industry became demoralized. In 1922 the National Oil Company failed. A receiver was appointed. The trust indenture was foreclosed, the property was bought in by a bondholders' protective committee, and the net proceeds entitled the plaintiff to a distributive share upon his bond of $5.84. The plaintiff was permitted to recover the $980 which he paid, with interest, diminished by the $5.84, his *pro rata* share upon distribution, together with interest received by the plaintiff on his bond before the receivership. The evidence supported the finding that the bond " was recommended as an investment and defendant was informed that it was bought for that purpose."

In sustaining this recovery the Court of Appeals said (at p. 87): " Ordinarily the actual pecuniary loss sustained as a direct result of fraud which induces a purchase of a chattel is the difference between the amount paid and the value of the article received. The seller's fraud is ordinarily complete and its effect exhausted at the time of the sale and transfer of the chattel. The buyer might sell or retain what he had bought. Subsequent increase or decrease of value might bring profit or loss to the buyer, but such

profit or loss would be the result of subsequent events and of choice by the buyer whether to hold or sell. It would not be the direct result of the seller's wrong nor increase or diminish his liability."

And (at p. 92): "The effect of the representations of the defendant did not cease with plaintiff's purchase. He continued to hold the bond for investment in accordance with the defendant's recommendation. Loss of his investment followed because the weakness of the company had been concealed from him by defendant.

"Proximate damages may not be fixed by arbitrary rule. * * * At least the plaintiff's proximate damages should be the difference between the price paid upon the purchase and the value of the bond at that time as an investment, the purpose for which it was understood that the plaintiff was buying. Ultimate loss of the investment was due to weakness inherent in the investment concealed by the defendant. * * * Change of conditions may have been a subsidiary cause; it was not an independent cause. The loss sustained is directly traceable to the original misrepresentation of the character of the investment the plaintiff was induced to make."

And (at p. 91): "Even if we had evidence upon which a definite estimate might be made of the value of the company's property which was covered by the trust indenture and constituted security for the bond issue, we should not be able to fix with certainty the value of the bond. The oil company held the stock of subsidiary companies which in turn owned the tangible assets. The stock of the subsidiary companies was pledged, their tangible assets were still at the risk of the business. Probability of payment of the bond issue depended primarily upon the success of the business and its efficient management. Though the company might not have failed if conditions in the oil trade had not become disturbed, there is room for inference upon this record that these disturbed conditions would not have caused the failure if the enthusiastic statements of the value of the company's assets contained in the circular had been true."

The crux of that decision is in the sentence that the effect of the representations of the defendant " did not cease with plaintiff's purchase." The representations consisted of a statement of the obligor's worth and past earnings as a basis for an estimate of its future probable success. The theory of the decision is that the representation continued in effect from the time of the purchase up to the time of the collapse of the company and the determination of the plaintiff's loss. In that case it would have been impossible to definitely determine the accuracy of the representations and the extent of the exaggeration except by the lapse of time.

In the case at bar the representation was merely as to the priority of the liens which secured the bonds. No claim of exaggerated value of the properties or as to their past or estimated future earnings is asserted. It is not claimed that the properties which secured the bonds at the time of the claimant's purchases were not of a value substantially in excess of all liens. No claim is made that at that time the rentals would have been inadequate to pay all carrying charges and interest and amortization payable upon these bonds. The truth or falsity of the salesman's representations was determinable from an examination of records at the time. In fact it is undisputed that at that very time, in prospectus and circular, S. W. Straus & Co., Inc., described the claimant's bonds and gave full definition of the subordinate character of the liens which secured them.

It is urged by the receiver that the authority of the agent to make the representations upon which the claimant relied, and the accountability of S. W. Straus & Co., Inc., for damages for deceit, has not been established. For the fraud of an agent, unauthorized or even prohibited by the principal, an aggrieved party may rescind and recover the consideration. The rule is otherwise where the injured party seeks damages in deceit. Then the principal is liable for misrepresentations of the agent only when they are authorized or incidental to the employment. (*Friedman* v. *New York Telephone Co.*, 256 N. Y. 392; *Harriss* v. *Tams*, 258 id. 229, at p. 235; *Deyo* v. *Hudson*, 225 id. 602; *Matter of Clark*, 233 App. Div. 487; *Spinner* v. *Bergen Associates, Inc.*, 237 id. 610; *Stoller* v. *Block Realty Co., Inc.*, 131 Misc. 689.)

The claimant, on the other hand, asserts that the representations were intimately connected with and incidental to the subject-matter of the sale of these bonds, and that it will be presumed that S. W. Straus & Co., Inc., had notice of the practice of its salesmen to represent these bonds as first mortgage securities, and that at least *prima facie* the representations will be deemed to have been made in the course of the employment. It is unnecessary to determine this question in view of the disposition of this claim about to be recommended.

I am of the opinion that whilst under the circumstances of this case the general rule declared in *Reno* v. *Bull* might be varied to meet the facts here presented, the rule declared in *Hotaling* v. *Leach & Co.* does not apply. Undoubtedly the claimant here might well fix his damage on the basis of the value of the properties which secured the bonds. If they then were not of a value affording a substantial margin above the existing liens, including that which secured claimant's bonds, a proper abatement in the value

of the bonds at the time of acquisition might be made, and the difference recovered here. No such evidence was presented. So, too, upon proof of the then existing or probable future income of the properties, taking into account the carrying charges, an estimate might be made of the value of the claimant's bonds. No such evidence was presented. No evidence was offered as to the fate of the bonds secured by the first mortgages on these properties. Their market prices are not shown. Other first mortgage bonds suffered declines as large as those attributed to the claimant's bonds.

In the last analysis, the decision in *Hotaling* v. *Leach & Co.* resulted from the necessities of the case. As Judge LEHMAN said (at p. 90): " If we hold that the plaintiff's damages are the difference between the market value of his bond at the time of its purchase and the price paid, we deny him all remedy in an action at law for the deceit."

There was a company whose financial worth and past earnings were misrepresented. It was not financially able, at the time the plaintiff acquired his bond, to meet its future obligations and weather adverse business conditions. The company failed. Its assets were sold. About one-half of one per cent remained of plaintiff's investment. The evidence warranted the inference that the collapse was directly due, not to economic conditions, but to a financial debility concealed from the plaintiff.

Here the record discloses no reason for doubt that had normal conditions continued, and had not the depression intervened, the ventures which secured these bonds would have prospered and both principal and interest paid. If the claimant is permitted to recover the damages he claims, there may be charged to S. W. Straus & Co., Inc., losses not flowing from the fraud charged, but from economic conditions for which it is not answerable.

Rulings since the decision in *Hotaling* v. *Leach & Co.* (*supra*) by intermediate appellate courts do not conflict with the views here expressed. (*Singleton* v. *Harriman*, 152 Misc. 323; affd., 241 App. Div. 857 [First Dept.]; *O'Hara* v. *Derschug*, Id. 513 [Fourth Dept.].)

However, giving full effect to the interpretation which the claimant places upon *Hotaling* v. *Leach & Co.*, the ruling there does not support the damages asserted here. There the plaintiff's loss was definitely fixed. The security for the bonds had been liquidated, the *pro rata* share was distributable and the difference between that and what was paid was recovered.

Here, the end has not yet come of claimant's investments. Changed conditions may restore both principal and interest. If the claimant is now permitted to recover practically his entire

investment as he claims, his money may be doubled. The receiver will have paid for a loss thus far appearing due to a demoralization of the real estate business — a loss that may eventually vanish.

Judge LEHMAN said (at p. 87): " The plaintiff should be entitled to recover from the defendants the loss which is the proximate result of the fraud that induced the investment; the defendants should not be held liable for any part of plaintiff's loss caused by subsequent events not connected with such fraud."

Lastly, there has been no adequate proof of the market value of these bonds at the time of the receivership. The nominal bid and asked prices are not sufficient upon which to predicate a finding of any real market values. Section 375-a of the Civil Practice Act, added by the Laws of 1934, does not aid the claimant. The reports published in periodicals " purporting to be the reports of market " prices, which are now admissible in evidence, are limited to an " article regularly sold or dealt in, in any regularly organized stock or commodity market." The bonds in question were not dealt in in any market or upon any exchange. Besides, the section provides that " the circumstances of the preparation of such a report may be shown to affect its weight," but not its admissibility. Here, the quotation reports were received in evidence. Their probative value, however, is nil.

I accordingly recommend a dismissal of the claim.

Report of referee confirmed by Mr. Justice LOCKWOOD September 25 1935.