**MARBURY MANAGEMENT, INC., and Harry Bader, Plaintiffs-Appellants-Appellees,**

v.

**Alfred KOHN, Defendant-Appellant,**

and

**Wood, Walker & Co., Defendant-Appellee.**

Nos. 129, 130, Dockets 79–7364, 7380.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1979.

Decided April 21, 1980.

George Berkowitz, New York City, for plaintiffs-appellants-appellees.

Jay H. Fischer, New York City (Fischer & Klein, New York City, of counsel), for defendant-appellant Kohn.

Charles A. Crocco, Jr., New York City (Lunney & Crocco, New York City, of counsel), for appellee Wood, Walker & Co.

Before MESKILL and KEARSE, Circuit Judges, and DOOLING,* District Judge.

* Of the Eastern District of New York, sitting by designation.

DOOLING, District Judge:

Marbury Management, Inc., ("Marbury") and Harry Bader sued Alfred Kohn and Wood, Walker & Co., the brokerage house that employed Kohn, for losses incurred on securities purchased through Wood, Walker allegedly on the faith of Kohn's representations that he was a "lawfully licensed registered representative," authorized to transact buy and sell orders on behalf of Wood, Walker.[1] After a non-jury trial before the Honorable Lee P. Gagliardi, District Judge, the court found that Kohn was employed by Wood, Walker as a trainee and that his repeated statements that he was a stock broker and his use of a business card stating that he was a "portfolio management specialist" were undeniably false; the court found further that Kohn made the statements with intent to deceive, manipulate or defraud in making them, and that his misstatements were material. The court found that Kohn's misrepresentations about his employment status caused Marbury and Bader to purchase securities from Kohn between summer 1967 and April 1969. The district court also found that the predictive statements Kohn made about various securities were not fraudulently made, and that there was no evidence that they were made without a firm basis.

Judge Gagliardi reasoned: a trainee at a brokerage firm can accept buy or sell orders by phone only under the supervision of a broker and cannot recommend the purchase of a security outside the brokerage office; moreover, the qualifications and expertise of a security salesman are particularly significant criteria in evaluating any information as inherently speculative as future earnings predictions; and a reasonable investor would consider the total mix of information that he received significantly altered if he learned that the investment advice was being furnished to him by a trainee in the field rather than by a specialist. Judge Gagliardi concluded that the important circumstance was that the terms "broker" and "specialist" themselves connote a level of competence to the reasonable investor. Thus, he held Kohn liable to plaintiffs under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Inferentially Judge Gagliardi found that Kohn's misstatements of his status not only induced the purchase of the securities involved but their retention as investments as well, until it became evident that Kohn was not, as his business card asserted, a "security analyst" and "portfolio management specialist" associated with Wood, Walker, but simply a trainee. Since both plaintiffs learned the true facts about Kohn's status on about January 28, 1970, Judge Gagliardi computed the damage award to each plaintiff by taking the difference between the price each plaintiff paid for the securities and either the selling price of the securities, if sold before January 28, 1970, or the value within a reasonable time after that date, if the securities were still held on that date.

Judge Gagliardi dismissed the plaintiffs' claims against Wood, Walker on the ground of plaintiffs' failure to prove that Wood, Walker participated in the fraudulent manipulation or intended to deceive plaintiffs; treating plaintiffs as basing their claims against Wood, Walker solely on the theory that the firm aided and abetted Kohn's fraud, the court found that the evidence supported neither a finding of conscious wrongful participation by the firm nor a legally equivalent recklessness but at best a finding of negligence in supervision.

Judge Gagliardi's findings of fact are not clearly erroneous. The cross-appeals of defendant-appellant Kohn from the judgment against him and of plaintiffs-appellants from the judgment exonerating Wood, Walker from liability raise questions of law that are hardly novel but are not free from difficulty in application. It is concluded that the judgment against appellant Kohn must be affirmed and that in favor of Wood, Walker reversed.

[1]. Harvey Jaffe was also a plaintiff but at the close of plaintiffs' case the action was discontinued as to him with prejudice and without costs, and the judgment stated that he was not entitled to relief. Jaffe has not appealed. The New York Stock Exchange, originally joined as a defendant, was dismissed from the action before trial.

1. The substantial question that the appeal of defendant-appellant Kohn raises is whether Kohn's misrepresentation was the legal cause of the loss for which Marbury and Bader have been allowed recovery. The securities bought did not lose value because Kohn was not a registered representative with Wood, Walker, and this case, accordingly, is not one in which a material misrepresentation of an element of value intrinsic to the worth of the security is shown to be false, and in which it is shown that disclosure of the falsity of the representation results in a collapse of the value of the security on the market. In such cases one induced to buy the security on the faith of the misrepresentation of the value element is obviously damaged, and the chain of causation is clear.

Here the claim and finding are that Kohn's statements by their nature induced both the purchase and the retention of the securities, the expertise implicit in Kohn's supposed status overcoming plaintiffs' misgivings prompted by the market behavior of the securities.[2] Plaintiffs' recovery of their whole loss measured by the decline in value of the securities to the date when they learned the truth certainly does not fit the familiar rubric, for example, of Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e)—limiting recovery on account of a false or misleading registration statement to the depreciation in value of the security resulting from the untruthfulness of the statement made about it. *Cf.* Restatement (Second) of Torts § 548A (Comment b, Illustration 1) (1977) (security bought on faith of untrue representation that issuer had received full consideration for it; later full consideration received by issuer, but a court invalidated the security on other grounds; buyer not allowed to recover his loss because it was not considered a proximate consequence of the untrue representation). But plaintiffs in such a case as this, whether or not their claims fall under the more familiar rubric, are, nevertheless, entitled to recover the damages that they suffered as a proximate result of the allegedly misleading statements, *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1291 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

As Judge Weinfeld observed in *Miller v. Schweickart,* 413 F.Supp. 1062, 1067 (S.D.N.Y.1970):

Proximate cause, of course, is a concept borrowed from the law of torts, and generally requires that one's wrongful conduct play a "substantial" or "essential" part in bringing about the damage sustained by another.

The generalization is that only the loss that might reasonably be expected to result from action or inaction in reliance on a fraudulent misrepresentation is legally, that is, proximately, caused by the misrepresentation. Restatement (Second) of Torts § 548A (1977). *See Levine v. Seilon,* 439 F.2d 328, 333–34 (2d Cir. 1971). *Oleck v. Fischer,* Fed.Sec.L.Rep. (CCH) ¶ 96,898, at 95,702–03 (S.D.N.Y.1979), *aff'd* 623 F.2d 791 (2d Cir. 1980), in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation. The case for Marbury and Bader is that, since the misrepresentation was such as to induce both their purchases and their holding of the securities, their holding and its duration determined the extent of their losses. As in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), the claim is that the misrepresentation was the agency both of transaction causation and of loss causation.

Liability for representations having the effects of Kohn's representation was famil-

2. Marbury's representative, asked why they had held one of the securities so long, answered that Kohn told them to do it, that it was going to go up; that Kohn had advised them to hold the other securities as well; and that Marbury continued to rely on Kohn's advice and to hold onto the securities until they learned that he was not a licensed and registered representative. (*See* 67a, 70a, 73a, 80a 81a, and 84a-85a.) Bader's testimony, while less detailed and pointed, leads to the same ultimate finding. (*See* 93a -94a, 97a- 99a, 106a, 113a, and 114a–116a).

iar in the law even before the Securities Act of 1933 and the Securities Exchange Act of 1934 were enacted. For example, in *Rothmiller v. Stein*, 143 N.Y. 581, 38 N.E. 718 (1894), the defendant officers of a small corporation told plaintiff that the company was prospering and would pay at least a 10% dividend, and they recommended that plaintiff reject an offer of $80 a share for his stock and accept an offer at $50 a share plus a deferred payment of $50 a share if there were an interim dividend of 10% on the stock. Plaintiff acted on the advice, relying on the defendants' fraudulent statements about the company's affairs. In holding defendants liable, the court said that defendants

> . . . cannot in such case shelter themselves under the statement that they did not make the representations, *i. e.*, commit the fraud with the motive or for the purpose of inducing the plaintiff to sell his stock. They intended to deceive the plaintiff and they were induced thereto by other causes, yet the natural, proximate and direct result of such deception they knew or had reasonable ground for believing would be this sale, although its accomplishment was not the particular purpose of their fraud. In such case their liability would seem to be plain.

*Id.* at 588, 38 N.E. at 719. So in *David v. Belmont*, 291 Mass. 450, 197 N.E. 83 (1935), plaintiff had retained stock of a certain company and bought additional shares of the same stock in reliance on certain representations made by defendant which were false. The court said:

> Presumably [plaintiff] continued to hold the stock after the purchase in reliance on the representations. The fraud was therefore continuing in its effect until such time as the plaintiff discovered the falsity of the representations. A loss which he suffered would manifestly be the difference in the then value of the stock and the price which he paid for it.

*Id.* at 454, 197 N.E. at 85. Similarly in *Cartwright v. Hughes*, 226 Ala. 464, 147 So. 399 (1933), the plaintiff bought stock of the defendants' bank on their representation

that it was "a good investment," that the bank was solvent, and that its assets were "good clean assets." The bank ceased to function and its stock became worthless. The issue in the appellate court was the appropriate measure of damages. Agreeing that the ordinary rule measures damages by the difference between value at the time of the fraud and what the value would have been had the representations been true (the so-called "warranty" measure of damages), the court said:

> The question of time is not often involved, but in such a transaction as this in 4 Sutherland on Damages, § 1172, at p. 4409, it is said that "the value of the stock sold is not uniformly fixed as of the time of the sale, especially if the purchase was made as an investment. The fraud in such a case has been considered operative until the purchaser learned of it; that is regarded as the time when his cause of action arose."

*Id.* at 467, 147 So. at 401.

The proposition that fraudulent representations may induce the retention of securities as an investment and entail liability for the damages flowing from retention was given a more general form in *Continental Insurance Co. v. Mercadante*, 222 A.D. 181, 225 N.Y.S. 488 (1st Dept. 1927). The court there said:

> Where the damage is caused by inducing plaintiff's inaction, it is necessarily more difficult to allege or prove causation than in those cases where active conduct is induced. Indeed, in all fraud cases, the element of proximate cause is more impalpable than in negligence cases because we are dealing with the plaintiff's state of mind. The defendants cannot, therefore, require the same exact proof of causation.

*Id.* at 186, 225 N.Y.S. at 494. See to the same effect *Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 93, 159 N.E. 870, 873 (1928) ("As long as the fraud continued to operate and to induce the continued holding of the bond, all loss flowing naturally from that fraud may be regarded as its proximate

result."); *Stern Bros. v. New York Edison Co.*, 251 A.D. 379, 381, 296 N.Y.S. 857, 859 (1st Dept. 1937) ("Fraud which induces non-action where action would otherwise have been taken is as culpable as fraud which induces action which would otherwise have been withheld."); *Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 470, 410 N.Y.S.2d 274, 276, 382 N.E.2d 1136 (1978). *See* 1 F. Harper and F. James, The Law of Torts 600–603 (1956).

■ Although the theory of plaintiffs' case relates their damages to the inaction of retaining the securities on the faith of their belief in Kohn's assertion of his status, the claim is nevertheless one within Section 10(b) and Rule 10b–5 because the representation relied upon was made in connection with the purchase of securities, and both Marbury and Bader sue as purchasers of securities. *Cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 755, 95 S.Ct. 1917, 1924, 1934, 44 L.Ed.2d 539 (1975) (private damage action under Rule 10b–5 is confined to actual purchasers or sellers of securities). The case is not one in which nothing has been shown except an inducement to hold as in *Parsons v. Hornblower & Weeks-Hemphill, Noyes*, 447 F.Supp. 482, 487 (M.D.N.C.1977), aff'd, 571 F.2d 203 (4th Cir. 1978), if that case is a correct reading of *Blue Chip.* Nor is this case similar to *Hayden v. Walston & Co.*, 528 F.2d 901 (9th Cir. 1975): there the plaintiffs had purchased securities through a salesman who was not a duly licensed registered representative, but did not show that the salesman's nondisclosure of his status rendered his other statements misleading within the meaning of Rule 10b–5, and there was, evidently, no claim or proof that he held himself out to be a duly registered representative. The second ground of suit rejected in the *Hayden* case, that a private right of action could be predicated on the violation of the National Association of Securities Dealers rules, has not been relied upon in this case, and was not a ground of decision in the district court.

It follows from what has been said that the judgment against defendant-appellant Kohn must be affirmed.[3]

2. Marbury and Bader have appealed from the judgment in favor of Wood, Walker. Judge Gagliardi considered the case against Wood, Walker as one in which plaintiffs sought recovery against Wood, Walker only "as an aider and abettor of Kohn's securities law violations." Judge Gagliardi found that the evidence did not show that Wood, Walker intended to deceive plaintiffs, or knew of Kohn's violations, or provided substantial assistance to Kohn in violating the securities law, but at most showed only negligence on Wood, Walker's part. Applying the standard of *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–48 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), the district court held that plaintiffs

3. The majority and dissenting opinions do not differ in recognition of the basic principles of proximate causation, in agreement that those principles apply to the torts of fraud and deceit, and that the critical issue is their application to those of Kohn's statements that Judge Gagliardi found to be untruthful and affective of the action of Marbury and Bader. Kohn, it is agreed, is liable only for the damages that his misrepresentations proximately caused. The dissenting opinion rejects what the majority opinion considered Judge Gagliardi's implicit finding that Kohn's representations, unrelated to the intrinsic characteristics of the stocks bought, induced both the purchase and the retention of the stocks on which the damages were computed. That is implicit in Judge Gagliardi's analysis of the representations and their culpable untruth, the period over which he found the untruth affective of plaintiff's conduct (that is, until Kohn's true status was disclosed), the measure of damages he employed, and his explicit reliance on *Clark v. John Lamula Investors, Inc.* and *Harris v. American Investment Co.* The majority opinion neither refuses to give effect to the traditional and acknowledged standard of causation, nor does it repudiate it, or refuse to abide by it. Differentiating transaction causation from loss causation can be a helpful analytical procedure only so long as it does not become a new rule effectively limiting recovery for fraudulently induced securities transactions to instances of fraudulent representations about the value characteristics of the securities dealt in. So concise a theory of liability for fraud would be too accommodative of many common types of fraud, such as the misrepresentation of a collateral fact that induces a transaction.

had failed to establish essential elements of their claim against Wood, Walker as an aider and abettor of Kohn's securities law violations. The court did not consider Wood, Walker's possible liability under the respondeat superior theory, or as a "controlling person" under Section 20(a) of the Securities Act of 1934, 15 U.S.C. § 78t(a). It is concluded, on this branch of the case, that the court's disposition of the "aider and abettor" issues was correct, but that it was error, on the record before the court, not to consider and determine whether Wood, Walker was liable as a controlling person or as Kohn's employer.

(a) Marbury and Bader have in this court again argued that Wood, Walker is liable because the evidence shows that it did aid and abet Kohn's commission of the fraud. If Kohn and Wood, Walker are regarded as distinct actors liable for each other's acts only to the extent of their conscious and intentional complicity in them, and the "aiding and abetting" theory requires that approach, Judge Gagliardi's conclusion is unassailable on the evidence. The circumstances on which plaintiffs rely to show that Wood, Walker should be held liable as an "aider and abettor" may suggest inadequate supervision and lax control but they do not show that the firm was guilty of "knowing or intentional misconduct" or of equivalently reckless misconduct. *See generally Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 200–201, 96 S.Ct. 1375, 1382, 1384, 47 L.Ed.2d 668 (1976); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 475, 483–85 (2d Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Rolf v. Blyth, Eastman Dillon & Co., supra*, 570 F.2d at 44–48.

(b) A threshold question on this aspect of plaintiffs' appeal relates to plaintiffs' right to argue that the court should have considered the respondeat superior and controlling person contentions. The district judge took the view, 470 F.Supp. at 515 n.11, that plaintiffs had not alleged that Wood, Walker was liable either as a controlling person or as a principal under the respondeat superior doctrine, and that, in consequence, the court did not need to consider Wood, Walk-

er's liabilities on either of those theories. In the opinion, *id.* at 515, the court said that plaintiffs' position, as expressed at the trial and in their post-trial memorandum of law, indicated that they sought recovery against Wood, Walker as an aider and abettor of Kohn's violations.

While plaintiffs have not denominated their argument in this court and in the district court a respondeat superior argument, and the complaint did not contain the traditional allegation that Kohn made the representations relied upon in the course of his employment with Wood, Walker, the evidence upon which plaintiffs rely in this court, as in the district court, and the allegations of fact made in the complaint are alike completely descriptive of the transactions and of the roles of the actors in them, and they are the evidence and allegations relevant to a determination of the respondeat superior issue, and inevitably, of the Section 20(a) issue. Plaintiffs' counsel argued the respondeat superior issue orally at the trial, and the bare failure to reiterate it in the closing brief in the district court cannot be considered an abandonment of the point.

■ The way in which the case was tried, and the shift in the emphasis of argument on the motion to dismiss arising from the introduction of *Ernst & Ernst* into the discussion may explain Judge Gagliardi's taking the position that he had to consider only the aider and abettor analysis, but the record evidence tending to support the plaintiffs' claim on the other two grounds was before the court, and, on the whole of that evidence, the three theories of liability—aider and abettor, controlling person, and respondeat superior—equally presented themselves for resolution. There was evidence of Kohn's hiring, his compensation, his authority to accept orders over the telephone at the firm's Bronx office, the execution by Wood, Walker of the orders Kohn obtained from plaintiffs, the fact that Wood, Walker received the brokerage commission on all the transactions, the extent to which and the circumstances in which

Kohn was authorized to recommend securities to the firm's customers, the uncertain provenance of Kohn's Wood, Walker business card, and the relation of the Bronx office of Wood, Walker to its main office. While plaintiffs' motion to conform the pleadings to the proofs—if the very factual complaint required amendment—was made in general form and was almost at once apparently confined to a narrow point on damages, the evidence, although not complete in every particular, disclosed each operative factual element of the transactions involved, and it thus invoked the application of whatever principles of law determined the outcome of the issues raised by the evidence.[4] *Cf.* Fed.Rules Civ.Proc. 15(b) (issues tried by implied consent treated as if raised in the pleadings, which may be amended to conform to the evidence at any time, although failure to amend does not affect the result of the trial of the issues); *Wasik v. Borg*, 423 F.2d 44, 46 (2d Cir. 1970) (third party defendant held directly liable to plaintiff although plaintiff did not plead against third party defendant where issues of fact tried between those parties).

■ It was then error not to pass on the respondeat superior and Section 20(a) issues which lurked in the record, unless resort to respondeat superior is precluded by Section 20(a) and the district court's rejection of the claim that Wood, Walker aided and abetted Kohn's violations implies a finding that Wood, Walker has a "good faith" defense

under Section 20(a). That section provides in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

This court has avoided explicit "resolution of the rather thorny controlling person-respondeat superior issue," *Rolf v. Blyth, Eastman Dillon & Co., supra*, 570 F.2d at 48 n.19. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812–13 (2d Cir. 1975), reasoned, in the light of the legislative history, that the "controlling person" provision of Section 20(a) was not intended to supplant the application of agency principles in securities cases, and that it was enacted to expand rather than to restrict the scope of liability under the securities laws;[5] the court, however, intimated no view as to cases involving minor employees, claims for damages, or respondeat superior which might be broader than the apparent authority involved in *Management Dynamics*, which dealt with actions of a principal executive officer using corporate facilities to create a misleading appearance of activity in the stock in question. A little later in

---

4.  Generally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim. *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir. 1978); *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 581 (8th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir. 1974); *Siegelman v. Cunard White Star Ltd.*, 221 F.2d 189, 196 (2d Cir. 1955); *cf. New York State Waterways Assn. v. Diamond*, 469 F.2d 419, 421 (2d Cir. 1972) (court's duty to read pleading liberally to determine whether facts alleged justify taking jurisdiction on grounds other than those most artistically pleaded).

5.  *Management Dynamics* discussed Section 15 of the Securities Act of 1933, 15 U.S.C. § 77*o*,

as well as Section 20(a). Section 15 originally made controlling persons liable under Securities Act Section 11 (imposing liability for untrue or misleading statements in a registration statement on issuer, underwriter and others involved with the registration statement) and Section 12 (imposing liability on sellers of unregistered securities or of securities sold by means of untrue or misleading statements) jointly and severally with the controlled person to anyone to whom the controlled person was liable. The Act which enacted the '34 Act amended Section 15 of the '33 Act by adding at the end "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

*SEC v. Geon Industries, Inc.*, 531 F.2d 39, 54–56 (2d Cir. 1976), the court, reiterating the view expressed in *Management Dynamics*, again rejected the theory that a brokerage firm called to account for an employee's activities could be liable only as a controlling person under § 20(a). The court, however, declined to enjoin the firm on the theory that as employer it was responsible for the acts of its employee, a registered representative, finding that the firm had exercised reasonable supervision over him, that he had made no special use of his connection with the firm, and that the firm derived only ordinary commissions from his activities. Judge Friendly stated for the court that "we intimate no view as to cases with different facts, and that situations which fall between [*Management Dynamics*] and this one will have to await future resolution." 531 F.2d at 55–56. Nevertheless, as a footnote in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 n.22 (5th Cir. 1975), illustrates, it has been thought that the Second Circuit has taken the view that Section 20(a) is the exclusive way to impose secondary liability.

The cases in this court are not, however, to that effect. *Moerman v. Zipco, Inc.*, 422 F.2d 871 (1970), *affirming on the district court opinion*, 302 F.Supp. 439 (E.D.N.Y. 1969), approved the imposition of liability on a corporation and its controlling directors under Section 20(a); but nothing in the district court opinion considered normal agency principles, or treated Section 20(a) as supplanting the doctrine of respondeat superior. The *en banc* decision in *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973), declined to impose Rule 10b–5 liability, through Section 20(a), on an outside director of BarChris Corporation for fraud perpetrated by other officials of the corporation in inducing the plaintiffs to exchange stock in their thriving company for shares of BarChris stock that soon became worthless. The *Lanza* case did not present any occasion for considering respondeat superior; only if the court had held that the director was in guilty complicity with the officials of the corporation who had perpetrated the fraud would the court have had

to decide whether the investment banking firm of which the defendant director was an employee was liable on a respondeat superior or Section 20(a) theory for its employee's delinquency. 479 F.2d at 1319–20 (opinion of Judge Hays, dissenting in part). The district court in *Gordon v. Burr*, 366 F.Supp. 156, 167–168 (S.D.N.Y.1973), adopted the view that Section 20(a) and not respondeat superior is the appropriate standard for determining secondary liability of a brokerage firm under the '34 Act, but this court, reversing the district court's imposition of Section 20(a) liability on a brokerage house by reason of the fraud of one of its stock salesmen, did not comment on the rationale of the decision in the court below; it said only that if the brokerage house was liable it must be "derivatively—as a 'controlling person' of [the salesman] within the meaning of § 20(a) of the 1934 Act." *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir. 1974). The court cited *SEC v. Lum's Inc.*, 365 F.Supp. 1046, 1064–65 (S.D.N.Y.1973), which rejected the respondeat superior approach, with evident approval, but the part of the *Lum's* opinion cited deals principally with the standard of culpability required for Section 20(a) liability, and that was the point on which this court cited it. Moreover this court has in *Management Dynamics, supra*, 515 F.2d at 813, stated that *Gordon v. Burr* does not dictate a result contrary to the application of agency principles to hold brokerage firms liable for acts of their employee; *Geon Industries, supra*, 531 F.2d at 54, states that this court has, in *Management Dynamics*, held the *Lum's* view—that a brokerage house could be liable for its employee's securities frauds only as a controlling person under Section 20(a) —to be erroneous. In *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 458 F.Supp. 1110 (S.D.N.Y.1978), the court held that a defendant was liable for its president's Rule 10b–5 frauds both on the respondeat superior and on the Section 20(a) theories, but the judgment was reversed because the evidence was insufficient to support a finding that the individual wrongdoer had aided and abetted the fraud

in question and because the damage to the plaintiff was occasioned by its own failure to exercise due diligence in the supervision of the account in question and by its own non-compliance with applicable regulations. 602 F.2d at 485–89.

Cases in other circuits are not in agreement about the relation of respondeat superior to Section 20(a) liability. The Eighth Circuit, in *Myzel v. Fields*, 386 F.2d 718, 737–739 (8th Cir. 1967), imposed Section 20(a) liability in a Rule 10b–5 case in which, on the evidence, the liability of the allegedly controlling persons was governed "neither by principles of agency nor conspiracy," but the court assumed that common law principles of agency would apply to impose liability on a principal for an agent's deceit committed in the business he was appointed to carry out.

The Sixth Circuit, in *Armstrong, Jones & Co. v. SEC*, 421 F.2d 359, 362 (6th Cir.), *cert. denied*, 398 U.S. 958 (1970), held, adopting the position of the Securities Exchange Commission, that sanctions may be imposed on a broker-dealer for the wilful violations of its agents under the doctrine of respondeat superior; the court did not refer to Section 20(a). In *Holloway v. Howerdd*, 536 F.2d 690, 694–95 (6th Cir. 1976), the Sixth Circuit, following what it took to be the lead of the Second, Fourth, Fifth and Seventh Circuits, went farther in holding that the controlling person provisions, Section 15 of the '33 Act and Section 20(a) of the '34 Act, were not intended to preempt the operation of the doctrine of respondeat superior in cases involving unlawful activities of a brokerage firm's employees. It imposed damage liability on the firm in favor of those customers of the firm who were ignorant of the limitations on the authority of the wrongdoing employee. The court relied on what had been said in *Management Dynamics, supra*, 515 F.2d at 812, to the effect that the controlling person provisions were intended to expand, rather than restrict, the scope of liability under the securities laws.

The Fourth Circuit, in *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974), a case brought under § 12(2) of the '33 Act, 15 U.S.C. § 77l(2), held a brokerage house liable "under familiar [agency] principles, for the tortious representations of its agent"; although the partners of the defendant brokerage house were personally blameless, they had clothed their departmental manager with actual and apparent authority to provide the purchaser of the security with information about its yield, the manager acted within the scope of his employment in offering the security to the purchaser, and the firm received compensation based on the manager's sales effort. The court held that Section 15 of the '33 Act, 15 U.S.C. § 77o, which imposes a controlling person liability parallel to that imposed by Section 20(a) of the '34 Act, was not intended to insulate a brokerage house from the misdeeds of its employees.

The Fifth Circuit in *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973), applied agency principles in imposing liability on a brokerage firm in a suit under Section 12(1) of the '33 Act for an employee's sale of unregistered stock to plaintiffs, notwithstanding that the brokerage house never received a commission or other benefit from the transactions, did not deal in unregistered securities in the course of its own business, and did not perform any of its usual brokerage functions in the completion of the sales transactions. Later, in a case in which liability under Rule 10b–5 could have been imposed only under Section 20(a) if the evidence had warranted it, the Fifth Circuit, under the mistaken impression that *Gordon v. Burr, supra*, had committed this circuit to the view that Section 20(a) was "the exclusive way to hold someone secondarily liable" in Rule 10b–5 cases, stated that such an approach might be unnecessarily restrictive to the securities acts but that it did not need to resolve that question in the case before it. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 n.22 (5th Cir. 1975). The Seventh Circuit in a "churning" case, *Fey v. Walston & Co.*, 493 F.2d 1036, 1052–53 (7th Cir. 1974), held a brokerage house liable for the conduct of

one of its officers, on the ground that "the general law rendered the broker liable for any churning conduct by its representative, and foundation for this result need not be sought within the confines of Section 20(a)." *Id.* at 1052. The Tenth Circuit in *Richardson v. MacArthur*, 451 F.2d 35, 41–42 (10th Cir. 1971), imposed Section 20(a) liability on an employing corporation in a Rule 10b–5 case, saying, "Liability under § 20(a) is not restricted by principles of agency or conspiracy." *Id.* at 41. The court did not make a respondeat superior analysis of the facts.

The earliest of the cases usually cited for the proposition that Section 20(a) of the '34 Act supplanted the doctrine of respondeat superior in securities cases, *Kamen & Co. v. Paul H. Aschkar & Co.*, 382 F.2d 689, 697 (9th Cir. 1967), does not elaborate the point, and *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1210 (9th Cir. 1970), which imposed liability in a churning case, did so under Section 20(a) on the basis that the broker-age house had failed to maintain adequate internal controls, and that its failure of diligence constituted failure to act in good faith; the court did not refer to the doctrine of respondeat superior. Later, in *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132–33 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), the court interpreted its earlier decision in *Kamen* as holding that Section 20(a) is to be applied to determine an employing corporation's liability and as rejecting the contention that "the more stringent doctrine of *respondeat superior* remained effective to establish vicarious liability." The court did not explain the basis for its conclusion. Most recently, in

*Christoffel v. E. F. Hutton & Co.*, 588 F.2d 665, 667 (9th Cir. 1978), the court, in a single sentence, and, again, without discussion, stated that it was "the established law of [the 9th] Circuit that section 20(a) supplants vicarious liability of an employer for the acts of an employee applying the respondeat superior doctrine."

The Third Circuit, in *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884–886 (3rd Cir. 1975), concluded in what is, it may be, elaborate dictum, that, in the light of the legislative history and of earlier cases, "the principles of agency, i. e., *respondeat superior*, are inappropriate to impose secondary liability in a securities violation case." *Id.* at 884. The court put its conclusion essentially on the ground that the defense furnished by the closing language of Section 20(a)—

> . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action—

established a standard of conscious culpability that was inconsistent with the imposition of an essentially secondary liability on respondeat superior grounds.[6] *Rochez Brothers* was followed in *Thomas v. Duralite Co.*, 524 F.2d 577, 586 (3rd Cir. 1975). In both cases liability was not in fact imposed under Section 20(a) because, in *Rochez Brothers*, the active wrongdoer, and not the corporation of which he was an officer, was the controlling person, and because, in *Duralite*, the active wrongdoers were not acting for the corporation in the transaction in the corporation's shares.[7]

---

**6.** Before turning to the question of the appropriate standards of secondary liability the court seems to have decided, in, agreement with the district court's factual finding, that a traditional agency analysis would not have resulted in a judgment against the wrongdoing individual's corporate employer; the wrongdoing employee was president, a director, and a 50% stockholder of the employing corporation, and he bought 50% of the corporation's stock from the corporation's executive vice-president without disclosing that there were in the wind two possible buyers for all the company's stock. 527 F.2d at 883 84.

**7.** *Rochez Brothers* noted that the relationship before it was not of the type that prevails in the broker-dealer cases where a stringent duty to supervise employees exists. 527 F.2d at 886. *Duralite* indicated that whatever the merit of imposing respondeat superior liability in a broker-agent relationship, the circumstances in the *Duralite* case were different and required a different result. For references to the effect of the presence of a fiduciary relationship, *see Edwards & Hanly v. Wells Fargo Securities Clearance Corp., supra*, 602 F.2d at 485; *Rolf v. Blyth, Eastman Dillon & Co., supra*, 570 F.2d at 47.

■ (c) While the precise standard of supervision required of broker-dealers to make good the good faith defense of Section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house, *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 823 (E.D.Wis.1977), and requires it to show at least that it has not been negligent in supervision, *SEC v. Geon Industries, Inc., supra*, 531 F.2d at 54; *Gordon v. Burr, supra*, 506 F.2d at 1085–86; *SEC v. Lum's, Inc., supra*, 365 F.Supp. at 1064–65, and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel. *Zweig v. Hearst, supra*, 521 F.2d at 1134–35. That Wood, Walker has successfully met the charge that it aided and abetted Kohn does not establish that it has borne the burden of proving "good faith" under the last clause of Section 20(a). The intimation of Judge Gagliardi's findings of fact is to the contrary; he was very far from finding that Wood, Walker had shown due care in its supervision and control of Kohn's activities.

Different considerations control the application of respondeat superior principles. Here the concern is simply with scope or course of employment and whether the acts of the employee Kohn can fairly be considered to be within the scope of his employment. *See* Restatement (Second) of Agency §§ 228, 229, 257, 258, 261, 262, 265. The evidence of record in the present case presents substantial issues of credibility and interpretation, but it indicates, if taken at face value, that Kohn at all times acted as an employee of Wood, Walker, and accounted to Wood, Walker for the transactions. The evidence contains no indication that he profited by any of the transactions other than by reason of his compensation from Wood, Walker as one of its employees. Whatever the specific limitations on his authority as between him and his employer, the evidence, again, indicates, although with some uncertainty, that it was his func-

tion as a trainee to be an intermediary in the making of transactions in securities, but that there were certain limitations on the manner in which he was to carry on his activities. Kohn's deviant conduct, while it may have induced the purchase of securities that would not otherwise have been purchased, did not appear, on the record made at the trial, to mark any deviation from Kohn's services to his employer. Arguably, what he did was done in Wood, Walker's service, though it was done badly and contrary to the practices of the industry and the standing instructions of the firm. The record on the respondeat superior issue more than sufficed to require the trier of the fact to dispose of the issue on the merits.

■ Where respondeat superior principles are applied, the special good faith defense afforded by the last clause of Section 20(a) is unavailable. Quite apart from the fact that that conclusion was clearly adumbrated in *SEC v. Management Dynamics, supra*, 515 F.2d at 812–13, and has become settled law in other circuits, there is no warrant for believing that Section 20(a) was intended to narrow the remedies of the customers of brokerage houses or to create a novel defense in cases otherwise governed by traditional agency principles. On the contrary Section 28(a), 15 U.S.C. § 78bb, specifically enacts that the rights and remedies provided by the '34 Act shall be in addition to any and all rights and remedies that may exist at law or in equity, and Section 16 of the '33 Act, 15 U.S.C. § 77p, similarly provides that the rights and remedies of the '33 Act are additional to pre-existing remedies.

The judgment against defendant Kohn is affirmed and the judgment in favor of Wood, Walker & Co. is reversed, and a new trial of the claims of Marbury Management and Harry Bader against Wood, Walker & Co. is granted.

MESKILL, Circuit Judge, dissenting:

In straining to reach a sympathetic result, the majority overlooks a fundamental

principle of causation which has long prevailed under the common law of fraud and which has been applied to comparable claims brought under the federal securities acts. This is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause. This elementary rule precludes recovery in the case at bar since Kohn's misrepresentations as to his qualifications as a broker in no way caused the decline in the market value of the stocks he promoted.

I share my colleagues' condemnation of Kohn's misconduct and express no view as to whether recourse may lie in an appropriate court under a theory more feasible than the one advanced by plaintiffs. In approving Kohn's present sanction, however, the majority is more righteous than right, for its decision abandons the traditional understanding of causation in the context of the sale of securities induced through misrepresentation, disregards governing precedent and extends the reach of Section 10(b) beyond that of its common law antecedent to provide for recovery in cases in which federal policies are offended by such expansion. Accordingly, I respectfully dissent.

The essential facts are undisputed and bear but brief recapitulation. While a trainee at the brokerage firm of Wood, Walker & Co., Kohn deceitfully held himself out to be a registered representative and "portfolio management specialist." Trading upon those non-existent credentials,[1] he persuaded Marbury Management and its principal shareholder, Bader, to purchase several highly speculative stocks. Contrary to a New York Stock Exchange rule requiring that purchase orders placed by novices be reviewed and approved by licensed brokers, Wood, Walker processed these orders without the necessary clearance. Despite Kohn's sincere belief in the bright prospects of each of these investments, their market value plummeted. The precise timing of their decline and the reasons therefor are not apparent from the record; it suffices for present purposes to note that Kohn's exaggeration of his expertise played no role in the economic collapse of the various stocks he had touted.

Under these circumstances, no recovery may be had against either Kohn or Wood, Walker under Section 10(b) since it is patent that the essential element of causation was not and could not be established as a matter of law. While it is true that Kohn's misrepresentations may have been a precondition of the ensuing injury in that the investments might not have been made had he revealed his lack of qualifications, those misstatements nevertheless do not constitute the legal cause of the subsequent pecuniary loss and consequently will not suffice to establish an actionable fraud.[2]

From time immemorial proof of proximate cause—the legal link between the misconduct alleged and the injury averred—

---

1. Plaintiffs also averred that Kohn falsely represented to them that he based his investment advice on "inside information." As to these claims, the trial court found, and it is not disputed here, that the statements were merely non-actionable projections.

2. Since the injury in the instant case derived from the unanticipated decline in the market value of the stocks Kohn had promoted, the situation is distinguishable from that presented in *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975). There, plaintiff mutual fund alleged that it had been defrauded by an investment advisory firm which after obtaining the fund's business deliberately proceeded to loot the assets placed under its supervision through unlawful investment. The mutual fund thereafter sued the independent auditors who had certified the advisor's extremely favorable, but false, financial statement, alleging that the misimpression gained from that document led the fund to retain the larcenous advisor.

In contrast to the instant case, *Competitive Associates*, in which we reversed a summary judgment in favor of the defendants, involved an alleged scheme which provided a direct connection between the wrong and the injury, uninterrupted by any intervening, independent cause. Thus, in that case a fraudulent scheme to pilfer the mutual fund was already afoot at the time of the violation, and the plaintiff's losses were inevitable upon the advisor's procurement of the account. The case at bar involves no such scheme, and plaintiffs' losses were certainly not intended by Kohn at the time he gained their account.

has been a precondition of recovery under theories of fraud and deceit. It is axiomatic that fraudulent misrepresentations are not actionable where the subsequent injury is due to an intervening or supervening cause. As applied to the sale of stock precipitated by misstatements, these principles of causation are satisfied only where the misrepresentation touches upon the reasons for the investment's decline in value. Thus, where one is induced to purchase securities in reliance upon a claim which, however deceitful, is immaterial to the operative reason for the pecuniary loss, recovery under a theory of fraud is precluded by the inability to prove the requisite causation.[3] *See, e. g., Hotaling v. A. B. Leach & Co.*, 247 N.Y. 84, 87, 159 N.E. 870, 871 (1928) ("The plaintiff should be entitled to recover from the defendants the loss which is the proximate result of the fraud that induced the investment; the defendants should not be held liable for any part of plaintiff's loss caused by subsequent events not connected with such fraud."); *Abel v. Paterno*, 245 App. Div. 285, 281 N.Y.S. 58 (1st Dept. 1935); *People v. S. W. Straus & Co.*, 156 Misc. 642, 282 N.Y.S. 972 (Sup.Ct. Kings Cty. 1935).[4] Prosser categorically states:

. . . if false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline of the market, or insolvency of the corporation, brought about by business conditions or other factors in no way related to the representations, will not afford any basis for recovery. It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

Prosser, *Law of Torts* ¶ 110 at 732 (4th ed.) (footnotes omitted).

The rationale for this exacting standard of causation is quite simply that one should be held liable only for the foreseeable consequences of one's action. Where the purchase of stock is induced through a misrepresentation, one is chargeable only for the consequences flowing from that statement; one does not thereby become an insurer of the investment, responsible for an indefinite period of time for any and all manner of unforeseen difficulties which may eventually beset the stock. This Court has previously remarked upon the necessity of thus restricting "the potentially limitless thrust of Rule 10b–5 to those situations in which there exists a causation in fact between the act and injury." *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), cert. denied, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). *See also Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) ("causation must be proved else defendants could be held liable to all the world"); *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) (Rule 10b–5 does not "establish a scheme of investors' insurance"). The Restatement (2d) of Torts takes a similar

---

**3.** Under the securities statutes, liability is limited by principles of causation even where the plaintiff is aided by a presumption in his favor. For example, under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, which proscribes false or misleading representations in registration statements, a plaintiff may recover the difference between the purchase price of a security and its market value at the time of the filing of his suit, without having to establish a causal connection between the false statement and the decline of the stock. However, the courts have permitted a reduction in damages to the extent that defendants can prove that the loss of value is due to reasons unrelated to the matters misrepresented in the registration statement. *See Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 584–88 (E.D.N.Y.1971), *and see* footnote 7, *infra*.

**4.** I respectfully suggest that the authorities cited by the majority in support of its broad notion of causality in fraud cases involving the sale of stock, many of them decided before the current federal securities laws were enacted and many involving the sale of tangibles, do not conflict with the more restrictive standard suggested here. For example, in *Hotaling v. A. B. Leach & Co.*, 247 N.Y. 84, 159 N.E. 870 (1928), Judge Lehman permitted recovery, but specifically noted, "The loss sustained is directly traceable to the original misrepresentation of the character of the investment the plaintiff was induced to make." *Id.* at 93, 159 N.E. at 873.

view. Discussing the situation in which the financial condition of a company has been misrepresented to the purchaser of stock the authors conclude:

there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition. There is, for example, no liability when the shares go down because of the sudden death of the corporation's leading officers. Although the misrepresentation has in fact caused the loss, since it has induced the purchase without which the loss would not have occurred, it is not a legal cause of the loss for which the maker is responsible.

Restatement (2d) of Torts § 548A at 107 (1977).[5]

Although the term causation is not itself used in Section 10(b) or Rule 10b–5, it has never been doubted that it is an essential element of a claim brought thereunder. This belief is based on the statute's common law ancestry, upon Section 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb, which limits recoveries to "actual damages on account of the act complained of," and upon case law, most notably *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), which recognized "the requisite element of causation in fact," and *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165,

168–169, 30 L.Ed.2d 128 (1971), wherein reference is made to the requirement that the defrauded party must suffer an injury as a result of the deceptive practice. *See also Titan Group, Inc. v. Faggen, supra*, 513 F.2d at 239 ("causation remains a necessary element in a private action for damages under Rule 10b–5."); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 238 (2d Cir. 1974) ("We have consistently held that causation is a necessary element of a private action for damages under Rule 10b–5."); *compare Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970) ("the test is properly one of tort 'causation in fact' "), *with Globus v. Law Research Service, Inc., supra*, 418 F.2d at 1291–92 ("there was sufficient evidence to support a finding of causal relationship between the misrepresentation and the losses appellees incurred when they sold.").

Mere factual causation however is not enough. Causation in cases under the securities acts is governed by the principle, set forth above, that the loss complained of must proceed *directly* and proximately from the violation claimed and not be attributable to some supervening cause. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 51, 97 S.Ct. 926, 954, 51 L.Ed.2d 124 (1977) (Blackmun, *J.*, concurring). While this rule is easily stated, its application to cases brought under the federal statutes has frequently been problematic since in such cases both the violation and the resulting loss must each be linked with the requirement of a securities transaction, whether it be a

---

5. The proposed ALI Federal Securities Code takes the same approach to the question of causation:

when the market declines after the published rectification of a false earnings statement that was used in the sale of an electronics stock, the misrepresentation is not the "legal cause" of the buyer's loss, or at any rate not the *sole* legal cause, to the extent that a subsequent event that had no connection with or relation to the misrepresentation occurred—for example, the sudden death of the corporation's president or a softening of the market in all electronics stocks. See *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 586–88 (E.D.N.Y.1971), 47 Ind.L.J. 367 (1972). . . .

[ ] That is to say, the basic distinction between reliance and *legal* cause bears emphasizing, because the two concepts are so frequently blurred: A buyer can have *relied* on a seller's misstatement of a material fact in deciding to buy; but, if the general market drops precipitately the next day on news of a political assassination or an invasion in some part of the world, the buyer's loss is caused not by the misstatement (except in the "but for" or *post hoc propter hoc* sense) but by the disastrous political news.

Tentative Draft # 2, § 215A at 5 (1973). (Commentary on § 220 of the Proposed Official Draft (1978)).

purchase or sale as would be the case in an action under Section 10(b), or the exercise of the shareholder's franchise, as would be the case in an action under Section 14.

That is, the violation must have precipitated the securities decision (be it a purchase or sale or a shareholder's vote), a requirement denominated as "transaction causation," and the victim's injury must also be proven to have derived from that same securities decision, a requirement somewhat ambiguously termed "loss causation," *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).[6] Attempts to prove the existence of each link in this somewhat elongated chain of causation have engendered considerable controversy. With respect to "transaction causation," it was frequently contended, particularly in nondisclosure cases, that plaintiff's course of action was in fact unaffected by the material omissions, and that this first link had not, therefore, been established. Such contentions have been rejected in several cases, *see Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970), and *Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153–54, 92 S.Ct. at 1472; *see also Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 495 F.2d at 238–40, which holds that in nondisclosure suits, transaction causation will be presumed when the matters withheld are material. *See Piper v. Chris-Craft Industries, Inc., supra,* 430 U.S. at 50–51, 97 S.Ct.

at 953–954 (1977) (Blackmun, J., concurring). Similarly spirited defenses have also been raised with respect to the second link, as defendants have claimed that the injury was not occasioned by a securities transaction, or that the connection between those events was too attenuated to satisfy the loss causation requirement. *See Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Hoover v. Allen,* 241 F.Supp. 213, 230 (S.D.N.Y.1965). *See also Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 401 (2d Cir. 1973) (Mansfield, J., concurring and dissenting).

In my view, these cases do not undercut the requirement that a single, direct causal chain run uninterrupted from the alleged violation through a securities transaction to a demonstrable injury. In resolving the technical problems of establishing transaction or loss causation, the courts have refused to create insuperable barriers to the demonstration of their existence, and in appropriate situations have allowed the element of causation to be demonstrated through resort to related notions such as reliance or materiality. Nevertheless, in facilitating the proof of causation, the courts have never renounced the element itself, and have never departed from the rudimentary principle that causation will not be found to exist where there is lacking a

---

**6.** "Loss causation," as the term is used in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 82 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), may mean nothing more than the proposition advanced here, that the injury must be proximately caused by the precise violation alleged. Thus, the Court noted that in order to recover in cases charging fraudulent misrepresentation or omissions,

> [T]here would have to be a showing of both *loss causation* —that the misrepresentations or omissions caused the economic harm— and *transaction causation* —that the violation in question caused the appellant to engage in the transaction in question.

507 F.2d at 380 (emphasis in original; footnote omitted). However, most commentators have construed this term to connote the necessary causal nexus between the securities transaction and the injury, rather than the requisite connection between the violation and the injury. *See, e. g.,* Jennings & Marsh, Securities Regulation *at 1068 -69 (4th ed. 1977). Judge Frankel, concurring in the result in Schlick, expressed reluctance about the phrase coined, see 507 F.2d at 384, and other courts have been noticeably reluctant expressly to adopt this language.* See, e. g., Moody v. Bache & Co., Inc., *570 F.2d 523, 527 n.7 (5th Cir. 1978);* St. Louis Union Trust Co. v. Merrill Lynch, Pierce Fenner & Smith, Inc., *562 F.2d 1040, 1048 n.11 (8th Cir. 1977),* cert. denied, *435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).*

single, logical procession from the violation to the injury.

On the contrary, the courts have consistently denied recovery of damages in situations, such as the present case, where the effect of the misrepresentation is merely to place a victim in a vulnerable position which subsequently leads to his injury due to a supervening event. For example, in *Oleck v. Fischer*, CCH [1979 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,898 (S.D.N.Y.1979), *aff'd*, No. 79–7513 (2d Cir. June 4, 1980), plaintiffs after reading defendant's prospectus sold it their business in exchange for promissory notes payable over time. The prospectus projected a favorable image of defendant's financial condition, due in part to a misrepresentation of the collectibility of a substantial debt owed defendant by a third party. That obligation was in fact defaulted upon, defendant underwent a financial collapse, and plaintiffs never received payment on their notes. The district court denied relief against the defendant or its independent accountant, however, since it held that the misrepresentation was not the operative cause for defendant's demise and plaintiffs consequent losses, which were in fact due to defendant's catastrophic losses in certain coal mining ventures which could not have been offset even if the debt had been fully discharged. Consequently, recovery was denied, *inter alia*, on the grounds that causation had not been established.

Again, in *Miller v. Schweickart*, 413 F.Supp. 1062 (S.D.N.Y.1976), a brokerage firm for several years engaged in an allegedly illicit arrangement with the Skelly Oil Company involving the sale and repurchase of bonds. Two years after this relationship had ceased, the brokerage firm went bankrupt, and its limited partners, who had allegedly invested due to the favorable financial picture made possible by the bond dealings, brought an action under the securities acts against the firm's general partners and Skelly. Finding that the brokerage firm's financial collapse was due to developments other than the consequences of the sale-repurchase agreement, Judge Weinfeld granted Skelly's motion for summary judgment, stating:

> To accept plaintiffs' theory would extend liability for fraud beyond the immediate and foreseeable consequences of one's wrongdoing and in effect make Skelly the permanent accomplice of the Schweickart general partners in all their subsequent parking transactions with others; it would subject Skelly to strict liability for any future depredations by those general partners long after Skelly had ceased to have any dealings with Schweickart, even for deeds done with others years later, of which Skelly had no knowledge. This is causation run riot.

413 F.Supp. at 1068.[7]

This fundamental principle of causation is equally well illustrated in the context of cases arising under Section 14. In *Mills v. Electric Auto-Lite Co., supra*, the Supreme Court held that where proxies are obtained

---

7. The standard of causation espoused here is also implicit in the manner of calculating damages in cases successfully prosecuted under Section 10(b). Generally, plaintiffs will be awarded the difference between their purchase price and sale price, with an adjustment for that portion of their loss which is attributable to factors other than those concealed or misrepresented such as a general market decline. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 48 50 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642 (1978). *But see Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 603-04 (2d Cir. 1978). *See also Bonime v. Doyle*, 416 F.Supp. 1372 (S.D.N.Y.1976), *aff'd*, 556 F.2d 554 (2d Cir. 1977), where the district court approved the settlement of a class action securities fraud suit over objection that the recovery was too meager, noting that while the stock purchases may have been fraudulently induced, the damages might in large measure have been attributable to other causes unrelated to the alleged misstatements. In rejecting a more lucrative method of computing damages, Judge Lasker stated:

> It therefore has the potential of creating a windfall recovery to a plaintiff in the nature of indemnification against the risks of the vicissitudes of the market, and at the same time saddling defendants with payments far out of proportion to the damage caused by their fraud.

416 F.Supp. at 1384. *See also Federman v. Empire Fire and Marine Ins. Co.*, 74 F.R.D. 151 (S.D.N.Y.1976), *rev'd in part on other grounds*, 597 F.2d 798 (2d Cir. 1979).

through the use of misleading solicitations, a damage action under Section 14 will lie to recover for harms later visited upon the corporation only if that resulting injury flowed from the corporate action for which shareholder approval had been sought:

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction.

*Id.* 396 U.S. at 385, 90 S.Ct. at 622.[8]

Where the misleading proxy solicitation is merely a first step which ultimately results in losses from an unrelated or supervening cause, relief cannot be obtained under Section 14. *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979), *petition for cert. filed*, 48 U.S.L.W. 3619 (U.S. Feb. 5, 1980); *Maldonado v. Flynn*, 597 F.2d 789, 795–96 (2d Cir. 1979); *see also Galef v. Alexander*, 615 F.2d 51, 65–66 (2d Cir. 1980). For example, if corporate officers are elected through solicitations which failed to disclose a material lack of qualifications, and those improperly elected officers subsequently proceed to harm the corporation and its shareholders through acts of deceit, waste or mismanagement which were not themselves authorized by the proxies, a suit to permit recovery of resultant damages

will not be permitted. *See, e. g., Limmer v. General Telephone and Electronics Corp.,* CCH [1977–78 Transfer Binder] Fed.Sec.L. Rep. ¶ 96,111 (S.D.N.Y.1977); *Levy v. Johnson,* CCH [1976–77 Transfer Binder] Fed. Sec.L.Rep. ¶ 95,899 (S.D.N.Y.1977).[9]

Essentially the same situation is presented by the case at bar. But for Kohn's misrepresentation of his expertise, plaintiffs might not have purchased the ill-fated stocks which he touted. Like the improper election of incompetent or larcenous officers, his misconduct was a precondition of the eventual loss. But since the actual damage in both cases stemmed from supervening events unrelated to the misstatements that induced the transactions, the chain of causation has been broken and recovery may not be had.

It might only be added that there seems to be no policy justification for the refusal to give effect to the traditional standard of causation. The mission of Section 10(b) is to give persons dealing in securities equal access to information so that informed investment decisions may be made. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). It is debatable whether today's decision will further that goal since Kohn's dereliction was not in withholding or misstating data material to the merits of the investments he recommended, but only as to his expertise in promoting them.

---

**8.** In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), shareholders of Auto-Lite alleged that the corporation's directors had violated Section 14 by soliciting proxies for approval of a merger with Mergenthaler Linotype Co. without disclosing in the proxy materials that they were nominees of Mergenthaler. The Court held *inter alia* that there was no need to demonstrate a connection between the precise misstatement and the ultimate harm, that is, there was no need to establish that the allegedly unfair merger terms were arrived at because of the split allegiance of the directors. Plaintiffs were required to demonstrate only that the shareholders' acquiescence in the plan had been unlawfully obtained:

> a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the

solicitation materials, was an essential link in the accomplishment of the transaction.

396 U.S. at 385, 90 S.Ct. at 622. This rule does not mandate a relaxation in the standard of causation suggested here since the violation in *Mills* lay not in the directors' advising approval of the merger, but in the procurement of shareholder acceptance of the plan through a failure to reveal that their ostensibly loyal directors who were recommending the proposal, were in fact corporate double agents.

**9.** *See also, Rediker v. Geon Industries, Inc.,* 464 F.Supp. 73, 82 (S.D.N.Y.1978); *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639, 643 (S.D.N.Y.1978); *Maldonado v. Flynn,* 448 F.Supp. 1032, 1040 (S.D.N.Y.1978), *aff'd in pertinent part,* 597 F.2d 789 (2d Cir. 1979); *Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628, 633 (S.D.N.Y.1978); *Goldberger v. Baker,* 442 F.Supp. 659, 666 (S.D.N.Y.1977).

On the other hand, repudiation of the traditional standard of causation will effectively thwart the oft-repeated goal of confining claims of corporate waste and mismanagement to the state courts which have the principal, if not exclusive, responsibility for such matters. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Superintendent of Insurance v. Bankers Life & Casualty Co., supra*, 404 U.S. at 12, 92 S.Ct. at 169 ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."). Under the causation test promulgated today the federal courts will be obliged to entertain suits brought by parties claiming to have been fraudulently induced to purchase stock which subsequently declined in value due to ineptitude, poor judgment or neglect. These are precisely the types of cases which this Court has refused to entertain, and yet, today's holding will open a back door to the federal courthouse for these same cases which have historically been left to state adjudication.

The majority offers no compelling rationale for its refusal to abide by the acknowledged standard of causation. It is emphasized that the misrepresentation in issue not only prompted the initial purchase but was later repeated so as to cause the retention of the stocks. This observation has no bearing on the principle governing this action. First, the trial judge did not make such a factual finding, and I do not believe that it can be "implied" from the opinion below. Factual support for such an approach appears to be lacking, since it may have been that Kohn's stocks all went into an immediate tailspin after their purchase by plaintiffs, and that they simply remained in this sorry state, or perhaps even revived somewhat, following Kohn's subsequent misrepresentations.[10] More significantly, this claim even if supported by the record would not supply the missing element of causation. The fact that the defrauded parties retained their stock after a reprise of Kohn's deception is no more the cause of the stock's loss of value than was Kohn's initial misrepresentation.

Because I view the causation issue as dispositive I would not consider whether it is permissible or advisable for this Court to formulate on plaintiffs' behalf theories of Wood, Walker's liability which were not averred in the pleadings, actively litigated or resolved by the trial court, *see* Opinion of the District Court, 470 F.Supp. 509, 515 n.11. Consequently, I intimate no view on the merits of those issues.

The judgment as to Wood, Walker should be affirmed and as to Kohn, reversed.

---

**10.** The only testimony on the subject concerns the stock prices on the date of purchase, the date of Kohn's unmasking and the date of sale.